# United States Court of Appeals
## For the First Circuit

Nos. 15-1347, 15-1412

GOOD SAMARITAN MEDICAL CENTER,

Petitioner, Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent, Cross-Petitioner.

Nos. 15-1877, 15-1941

NATIONAL LABOR RELATIONS BOARD,

Petitioner, Cross-Respondent,

v.

1199 SEIU UNITED HEALTHCARE WORKERS EAST,

Respondent, Cross-Petitioner.

PETITIONS FOR REVIEW OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD

Before

Torruella and Barron, Circuit Judges,
and Lisi,[*] District Judge.

Joseph W. Ambash, with whom Reyburn W. Lominack, III and
Fisher & Phillips LLP, were on brief, for Good Samaritan Medical

_____

[*] Of the District of Rhode Island, sitting by designation.

Center.

Betsy Ehrenberg, with whom Pyle Rome Ehrenberg PC, was on brief, for 1199 SEIU United Healthcare Workers East.

Gregoire F. Sauter, Attorney, National Labor Relations Board, with whom Usha Dheenan, Supervisory Attorney, Richard F. Griffin, Jr., General Counsel, Jennifer Abruzzo, Deputy General Counsel, John H. Ferguson, Associate General Counsel, and Linda Dreeben, Deputy Associate General Counsel, were on brief, for The National Labor Relations Board.

————————————

May 31, 2017

————————————

**TORRUELLA**, **Circuit Judge**.  Camille A. Legley, Jr. was a probationary employee hired by Good Samaritan Medical Center ("Good Samaritan").  During an orientation training he questioned a union delegate's alleged remark that he had to join 1199 SEIU United Healthcare Workers East ("the Union"), in order to work at Good Samaritan.  The exchange became heated and the following day Good Samaritan terminated his employment claiming that his conduct had violated its civility policy.  Upon Legley's complaint, an administrative law judge ("ALJ"), followed by the National Labor Relations Board ("NLRB" or "the Board"), found that the Union caused Good Samaritan to discharge Legley because of his protected conduct, in violation of Section 8 of the National Labor Relations Act ("NLRA" or "the Act").  Good Samaritan Med. Health Ctr., 361 N.L.R.B. No. 145 (Dec. 16, 2014).  The NLRB ordered the Union and Good Samaritan to, inter alia, reinstate Legley with back pay and rescind the workplace civility policy.  Because we find considerable contradictory evidence in the record that the NLRB failed to consider, we do not find substantial evidence on the record as a whole that Legley was discharged because of his protected conduct and decline enforcement of the NLRB's order.

## I. Background

**A. Hiring Process**

During the fall of 2011 Legley applied and interviewed for a position at Good Samaritan as a part-time boiler operator. Good Samaritan has a collective-bargaining agreement with the Union pursuant to which employees are required to either be members of the Union or to pay it an agency-service fee.[1] Also of relevance, Good Samaritan maintains a workplace civility policy.[2]

---

[1] "Section 8(a)(3) of the [NLRA] permits an employer and an exclusive bargaining representative to enter into an agreement requiring all employees in the bargaining unit to pay periodic union dues and initiation fees as a condition of continued employment, whether or not the employees otherwise wish to become union members." Commc'ns Workers of Am. v. Beck, 487 U.S. 735, 738 (1988).

[2] The policy states:

> [Good Samaritan] recognizes that excellent care is best delivered in a work environment of respect and cooperation.
>
> As a [Good Samaritan] workforce member I will:
> • Treat all coworkers and individuals with respect, patience and courtesy;
> • Refrain from conduct that would intimidate or threaten other individuals;
> • Never engage in abusive or disruptive behavior;
> • Not tolerate any threats of harm -- either direct or indirect -- or any conduct that harasses, disrupts, or interferes with another workforce member's work or performance or that creates a hostile work environment.

Between September and November of 2011 Legley attended multiple interviews with Facilities Manager Sean Brennan as well as two employees who report to Brennan: Kevin Jordan and Neal Nicholaides. Jordan and Nicholaides are both union delegates. On November 28, 2011, Good Samaritan offered Legley a job on the weekend evening shift at its Brockton, Massachusetts location. On December 5, 2011, Legley reported to Good Samaritan's human resources department in order to complete required paperwork and to submit to a required physical. In their testimony to the ALJ, three women who met with Legley that day, Human Resources Manager Jennifer Patnaude, administrative assistant Jennifer Dorsey and medical assistant Annette Miller, all testified that they found Legley to be difficult. Legley testified that on this date he met with "two or three ladies,"[3] and he did not perceive there to be any conflicts; he believed he was cooperative and did not give them a hard time in any way. Patnaude, on the other hand, was so concerned about Legley's behavior that she called Brennan to ask if he really wanted to hire Legley. Brennan replied in the

_____

[3] During his testimony, in contrast to his memory regarding male staff members, Legley could only name by name one female employee that he met during his time at Good Samaritan, and he could not identify any of the females present during his testimony to the ALJ including, apparently, the union delegate whose conduct is a central concern to this case, Darlene Lavigne.

-5-

affirmative stating that Legley had interviewed well and was being hired to fill a difficult-to-staff shift.

## B. Orientation Meeting

Legley's first day of work was December 19, 2011 when he reported for a mandatory training. Legley and three other new hires (all women) reported to the building's lobby and then, due to an elevator malfunction, were required to walk up five flights of stairs to the training room. Legley lagged behind the other attendees and, as a result, the first session had already begun when he entered the training room. Legley took a seat at the head of the table, closest to the presenter.

The first twenty minutes of the orientation were dedicated to the Union. On this day the Union's portion of the orientation was presented by Darlene Lavigne who had been employed at Good Samaritan for almost 30 years. She had also been a union delegate for the previous ten years and gave these presentations approximately twice a month. Lavigne's presentation typically included information on the Union and its benefits and included handouts explaining the Union as well as paperwork soliciting contact information from the new employees.[4]

---

[4] The paperwork itself is not at issue before us but we note that neither the ALJ nor the NLRB discuss the confusing nature of the form. Although the paperwork makes clear that employees do not have to join the Union and can become fee payers, the portion of the form soliciting contact information (information the Union

-6-

The events of this meeting are under dispute. Three individuals testified about it before the ALJ: Lavigne, Legley and Kimberly Derby, one of the other new hires. Legley testified that when he arrived in the room he expected to find an HR representative, so he was confused by the fact that the discussion seemed to be focused on the Union. He further testified that the woman speaking (later identified as Lavigne) "was talking about you had to join the union to work here and all of that." Legley stated that he "was so mixed up with what was going on," because he expected a human resources representative and instead received a "union steward."

Not long into the presentation, Legley reportedly said to Lavigne "I understand there's a state or federal law that you don't have to join a union," to which Lavigne reportedly stated "You still have to join the union." According to Legley, at this point Lavigne "got kind of upset."

Lavigne continued with her presentation and Legley proceeded to read the materials given to him. Within these materials he found a paragraph essentially stating that "you do

---

collects from every employee, whether that employee chooses to become a member or simply a fee payer) appears to be a union-member application form. Thus, while the paperwork makes clear that no one is obligated to join the Union, the form that everyone is required to fill out appears to be a membership application form.

not have to be a member of 1199, the union, and that you can contribute your monies to some agency in the hospital." Legley proceeded to read the relevant language out loud to Lavigne, who, according to Legley, "got very upset and mad." Legley testified that after this "she was in a different mood, she was -- you could tell she was very upset and everything." Legley believes that Lavigne said on four to six occasions that they had to join the Union in order to work at the hospital.

Legley admitted that he "was a little upset because I didn't know what was going on. I thought it was going to be an HR meeting and it turned out to be a union meeting, and I just never ran into a situation like this before," but he denied raising his voice and being angry, disruptive or rude.[5] In contrast, he characterized Lavigne as "[r]ude, aggressive, she looked mad, she was definitely upset that I asked a couple of those questions." Legley testified that Lavigne looked at him with "evil eyes."

Derby testified that she also understood Lavigne to be saying that "in order to work for Good Samaritan Hospital . . . you needed to join the union." Derby described the meeting as "an

---

[5] Though he did testify that he was upset because he felt that Lavigne was "not telling the truth over and over again," that he felt he "was being intimidated to join this union" and that "she was lying because she was telling [him] something that wasn't true."

open forum meeting, so I don't necessarily think he interrupted her" and said that while he had a loud voice "he had a normal tone." Derby testified that Lavigne's response was that yes, he did have to join the Union. She testified that Lavigne became irritated after Legley told her that he thought there was a law saying that he did not have to join the Union. Derby felt that Legley's questions were not "being validly answered."

At the same time, Derby also stated that the "conversation was escalating" and described both Lavigne and Legley as "irritated" in demeanor. Derby referred to Legley's demeanor as "irritated and passionate," said that his "voice became louder," indeed, that "[b]oth parties had raised voices." Derby agreed that he was "pretty passionate about being sure there was a law," "was very forceful and energetic in his presentation," that "he was a big guy with a big voice, so the impression he made on you was of a big presence in the room," and that there seemed to be an "escalation."

Derby testified that Legley asked if he could make copies of all of the paperwork and that Lavigne "was really irritated with him for asking to make copies." Derby said that it was around this time that Lavigne asked Legley his name and what department he would be working in and "stated that she knew the people that worked down there, and she was going to warn them that he was

coming, and that they would not put up with him." Derby testified to being horrified by this exchange because she took it to be "a threat."

In contrast to Legley's testimony, Lavigne testified that the first thing Legley did when he walked in the room was point a finger at her and say "[y]ou were supposed to meet me in the lobby." She described him as interrupting a total of three or four times to complain about not being met downstairs and having to climb all the flights of stairs. She described his presence as being overbearing. She felt that he "was consuming the meeting." She testified that "[h]e wasn't yelling, but he was talking loudly. He was exerting his power, like he was just -- it was all about him, all about him and his questions, his concerns." Lavigne testified that if someone does not want to join the Union she typically tells them there is information in "the yellow section on the back of [the] form" but that "he didn't let me." She testified that she "was upset because of the interruptions, the rudeness, the overpowering of my presentation." She described him as "[o]verbearing. I thought he was scaring the other ladies, myself. I mean they're like they were shocked. They were like waiting to see like what's going to happen next." She said that at the end of the session she "was really emotionally upset . . . To be treated in such a manner." She testified that he

was disrespectful by "[c]onstantly interrupting. Constantly making me feel that I didn't know what I was doing, constantly taking over the whole presentation, the whole presence of the room." She testified that her main concern was not his questioning whether he had to join the Union but "his rudeness, his overpowering of the whole meeting. I mean I was just there to give information to people, not to make people do anything."

By the end of the meeting Legley had completed the application to join the Union. He testified that he "wanted to be like everyone else" and there "seemed to be a lot of benefits to belonging to this union." Derby completed an application in which she elected to make a contribution to the political action fund, though at a rate lower than that recommended by Lavigne. Derby testified that when she left the meeting she "still felt like I had to join the union."

## C. Post-Orientation Meeting

Lavigne testified that as she exited from the meeting she encountered Rebecca Cadima, the human resources representative who would lead the remainder of the orientation, and told her "he really, really gave me a hard time. And [Cadima] said, I know, he gave me a hard time, too." She further testified that after she arrived home she called Mary Ellen Leveille, an employee of the Union who was the lead administrative organizer for the team

that included Good Samaritan, to vent, saying to Leveille that she owed her "big time" and that at the orientation Lavigne had

> had this person, he was rude. He was constantly interrupting me. He wouldn't let me give a proper presentation. He was overbearing. And I've never, ever had a new employee act like this. Why would someone come into a new business, the first day, and act like this? You don't do that.

Leveille testified that "[Lavigne] was choked up, like she was crying" and "I've never seen her be upset like with this situation." Leveille further testified that Lavigne told her that Legley "was very intimidating. He started pointing his finger at me and yelling at me, and I couldn't get through everything I had to tell everybody." Leveille stated that "my impression was that she just got so flustered because he just came in the room and, in her words, he blew up the orientation." When asked if at some point Lavigne mentioned his question of whether he had to join the Union, Leveille replied

> I don't recall. I mean because that wasn't what the conversation was. She was really upset. I was trying to calm her down because she just felt very intimidated by the situation that had happened. I don't even recall talking about anything to do with union membership, because that wouldn't be important.

Lavigne next called Nicholaides, who testified that he received a call from Lavigne on December 19 after the orientation meeting. Nicholaides said that he could tell from her voice that

she "was extremely upset," that "her voice was shaky, she told me she had never been treated this way before, that he came in right from the get-go complaining that he had to walk up the stairs," and that "he was calling her a liar basically, and [saying] that she wasn't telling the truth."[6]

Nicholaides testified that because "[Lavigne] was so upset I immediately called [Cadima] . . . to see if she could just give me some more insight on what happened." Cadima reported that she had not seen what transpired, but said that she felt they were "going to have [their] hands full with [Legley]. He ran [them] through the ringer." Nicholaides further testified that his conversation with Cadima did not involve any discussion of the content of the dispute between Lavigne and Legley and that his primary concern was how upset Lavigne was because "it's just not [Lavigne]'s nature to get that upset. And I was very concerned

---

[6]  We note that the ALJ made a finding that there was no credible evidence that Legley accused Lavigne of being a liar.  It is not clear whose credibility this finding is intended to impugn (if anyone's).  Lavigne did not actually testify that Legley had called her a liar.  As identified here, Nicholaides testified that Lavigne told him that Legley was "basically" calling her a liar, which indicates that the term was a summation of how she felt rather than a direct quote.  Nicholaides testified that Legley accused Lavigne of lying to him, but that conversation occurred on the following day and it does not appear from context to be what the ALJ was referring to.

for her when she called -- she sounded over the phone like she was practically in tears."

Leveille testified that following her conversation with Lavigne she called Nicholaides and, using "some choice words," said "what the heck is going on, a worker that is going to be working with you guys just gave [Lavigne] a really hard time in orientation. She called me. She's crying. And you know [Lavigne]; this isn't like her, what's going on." They both testified that their conversation focused on how surprising it was that someone would act like that on their first day of work.

Testimony is somewhat confusing as to when anyone in management at the hospital heard about what happened. There is some indication that Nicholaides may have spoken to Brennan, the facilities manager.[7] Whenever the conversation occurred, Nicholaides was clear that the focus of any conversation was "how disruptive [Legley] was at the meeting and how upset he got [Lavigne]." Nicholaides testified that the content of the dispute was not discussed because he "was told [Legley] joined the union, so to me that was a nonissue."

---

[7] Scott Kenyon, head of facilities, testified that he had heard of what happened at the orientation from Brennan, but his testimony is not specific as to when or how this conversation came about.

-14-

The next day, December 20, was Legley's first day in the boiler room. Jordan, whose job it was to train Legley, testified that when Legley arrived at work that morning, he said "[w]e may have a little problem" and went on to say that he "had a disagreement with the girl giving the orientation." Jordan took Legley to meet with the other two union delegates, Nicholaides and Monahan, because he thought it sounded as though there might "be a disciplinary problem." Jordan said that Legley told the three of them that "the girl at the orientation wasn't telling the whole truth. She said you had to join the union" and he said something to the effect of "[m]aybe I'm not a good fit here."[8]

Patnaude, Nicholaides and Kenyon each testified that later that day at a luncheon Nicholaides approached Patnaude, Tom Watts (the head of Human Resources) and Kenyon to talk about what had happened at the orientation and how upset Lavigne was when he spoke to her.

---

[8] Legley also testified that at this meeting Nicholaides told him that Lavigne had made complaints to the "head of the union in Boston," "the head of HR," and "the head of personnel" and that Nicholaides said that because of him Lavigne did not get any contributions to the political action fund. Nicholaides testified that at no point did he discuss with anyone (Legley or anyone else) the political action fund contributions and that he typically would not even have information about those contributions. Additionally, Derby testified that she signed up to contribute to the fund. The testimony of Lavigne, Leveille, Nicholaides and Patnaude indicates that the only persons Lavigne spoke with were Cadima, Leveille and Nicholaides.

Patnaude's testimony was the most detailed as to the content of the conversation. She testified that they

> talked about the incidents at orientation, how rude [Legley] was to [Lavigne], that he had made her cry she was so upset. And I, at that time, expressed the fact that I didn't want to hire him in the first place and he was disrespectful when he came in and interviewed with me, he was very rude. And then when he came in to complete his new hire paperwork, he was rude to the HR staff. He was also rude when he went to employee health.

After Nicholaides left, Patnaude, Watts and Kenyon

> talked about the length of time it would take to train [Legley], to get him up to speed with the facility and the different duties that he would have beyond what he would do as a boiler operator, and decided at that point to cut our losses and terminate his employment.

Kenyon testified that Legley's questions about joining the union did not impact his decision to terminate him and that his primary concern was that "these are not the kind of individuals that we want working at Good Samaritan, you know, we treat [people] with dignity and respect. We expect other people to treat other people with dignity and respect." Kenyon did not want to invest resources training someone who was going to behave this way. Kenyon further testified that he did know the content of Legley's objections at the time he made the decision to terminate him. Jordan testified that after the decision was made Kenyon told him something to the effect of "Mr. Legley being trouble and not a

-16-

good fit because of the 'I believe' code and said he wasn't going to take a chance of having [a] disruption in the department."

Patnaude testified that ultimately it would have been Kenyan who would terminate an employee in his department, though she said that the decision was more typically a collaborative one between herself, Watts and Kenyon. She testified that Legley was terminated "[f]or his inappropriate disrespectful behavior." She further elaborated that:

> [H]e was disrespectful and rude at every point along the process to hire him. And then once he came on board, was very disrespectful in the orientation, made our employee very upset by his behavior, and then also expressed the fact that he wasn't even sure he wanted to work here the next day. And also taking into account the fact that it would take time to train him and the shift he would be on, and there would really be no supervision on that shift, and that was a concern.

She also explained that they were concerned that they could be "subjecting our employees on the night shift to that behavior," meaning "getting upset, getting frustrated with [Lavigne], just being, you know, being upsetting to other people. And if he's going to do that on his first day of employment, what's he going to do when he's comfortable[?]" She testified that his "comments regarding his questions about the necessity of joining the union" did not play any role in the decision to terminate his employment.

## D. Procedural Background

### 1. ALJ

Legley filed a complaint with the NLRB. Following a hearing, the ALJ concluded that both Good Samaritan and the Union had violated the NLRA in discharging and causing the discharge of Legley (respectively). He additionally found that Lavigne threatened unspecified reprisals against Legley in violation of Section 8(b)(1)(A) of the Act.

In arriving at these findings the ALJ believed the applicable precedent to be Atlantic Steel Co., which asks whether an employee has lost protection of the Act via misconduct on his part. 245 N.L.R.B. 814, 816 (1979). He therefore focused his analysis on the interaction between Legley and Lavigne, and he concluded that Legley did not make "any statements that could be construed as being threatening or profane," nor did he act in an "overly aggressive manner." Rather, "[a]t most, both Legley and Lavigne raised their voices when he said he didn't have to become a union member and she said that he did." He determined that "the evidence convinces me that nothing that [Legley] said or did at this meeting could compel a conclusion that he lost the protection of the Act by virtue of any misconduct on his part." Applying the test annunciated in Atlantic Steel, he found that Legley's

misconduct could not justify his discharge, and stated that "in the absence of legally defined misconduct," he could not

> separate the protected nature of his comments from the way he made the comments. As his behavior at the meeting did not meet the criteria of Atlantic Steel, [Legley's] statements regarding union membership and the tone in which he made the statements cannot be disentangled. Therefore, as the Company discharged Legley because of these protected statements, a Wright Line analysis is not even appropriate.

## 2. NLRB

The NLRB agreed with the findings and conclusions of the ALJ, though with slightly modified legal analysis. With regard to the Union, the NLRB first found that the Union caused Legley's discharge. Applying two different frameworks, duty of fair representation and Wright Line, the NLRB then concluded that the Union's conduct in causing Legley's discharge violated the Act. Wright Line, a Div. of Wright Line, Inc., 251 N.L.R.B. 1083 (1980), enforced on other grounds, 662 F.2d 899 (1st Cir. 1981), cert. denied, 455 U.S. 989 (1982), approved in NLRB v. Trans. Mgmt. Corp., 462 U.S. 393 (1983). With regard to Good Samaritan, the NLRB applied Palmer House Hilton and Mohamad Safavi Unite Here, Local 1, 353 N.L.R.B. 851 (2009), and concluded that "the Employer learned of Legley's protected conduct at or near the same time as the Union's effective request that he be disciplined for that conduct" and then further "failed to show that it would have

discharged Legley in the absence of his protected activity." Having so concluded, the NLRB affirmed the ALJ's finding that both the Union and the employer violated the Act.

## II. **Legal Frameworks**

## A. **Standard of Review**

In examining factual determinations, the question we must answer is whether the NLRB's decision is "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). The requirement that there be "substantial evidence" arose out of the Supreme Court's interpretation of the Wagner Act, which provided that "[t]he findings of the Board as to the facts, if supported by evidence, shall be conclusive." Act of July 5, 1935, ch. 372, § 10(e), 49 Stat. 453. The Supreme Court interpreted this to indicate "substantial evidence," meaning "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938). Over time, however, it became the practice of some of the courts of appeal to uphold the Board's findings whenever "the evidence supporting the Board's result was 'substantial' when considered by itself." Universal Camera Corp. v. NLRB, 340 U.S. 474, 478 (1951). In other words, all that was required of the reviewing court was to "find in the record evidence which, when viewed in isolation,

substantiated the Board's findings." Id. Apparent dissatisfaction with this level of review led to an amended standard in the Taft-Hartley Act, which amended 29 U.S.C. § 160(e) to its present form: "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." Id. at 478-86. Interpreting this amended standard, the Supreme Court held that its effect was to "definitively preclude[] . . . a theory of review" that allowed the reviewing court "to determine the substantiality of evidence supporting a . . . Board decision merely on the basis of evidence which in and of itself justified it without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." Id. at 487-88. In other words, "[t]he substantiality of the evidence must take into account whatever in the record fairly detracts from its weight." Id. at 488.

This means that while "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence," NLRB v. Hilliard Dev. Corp., 187 F.3d 133, 140 (1st Cir. 1999) (quoting Am. Textile Mfrs. Inst. v. Donovan, 452 U.S. 490, 523 (1981)), our review "must take contradictory evidence in the record into account," Howard Johnson Co. v. NLRB,

702 F.2d 1, 2 (1st Cir. 1983), and "[t]he Board . . . may not distort the fair import of the record by ignoring whole segments of uncontroverted evidence," Hilliard at 140 (quoting Maine Yankee Atomic Power Co. v. NLRB, 624 F.2d 347, 360 (1st Cir. 1980)). Moreover, "[w]hen the Board purports to be engaged in simple factfinding, . . . it is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 378 (1998).

While the substantial evidence standard governs our review of the facts, we also evaluate the Board's decision for "mistakes of law . . . and arbitrary and capricious reasoning." Boch Imports, Inc. v. NLRB, 826 F.3d 558, 565 (1st Cir. 2016) (quoting The Edward S. Quirk Co., Inc. v. NLRB, 241 F.3d 41, 42 (1st Cir. 2001)). One of the bases for finding an agency decision arbitrary and capricious is a deviation from its own prior precedents without sufficient explanation or reasoning. Shaw's Supermarkets, Inc. v. NLRB, 884 F.2d 34, 36-37 (1st Cir. 1989).

## B. Protected Activity

The Act both grants employees the right to form and join unions and to refrain from such activity, 29 U.S.C. § 157 (Section 7), and it defines as an unfair labor practice any action by the employer that "interfere[s] with, restrain[s], or coerce[s]

employees in the exercise" of those rights. 29 U.S.C. § 158(a)(1) (Section 8(a)(1)). Employers may not discriminate "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization," 29 U.S.C. § 158(a)(3) (Section 8(a)(3)), and it is unlawful for a labor organization or its agents either "to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title," (Section 8(b)(1)(A)) or "to cause or attempt to cause an employer to discriminate against an employee" (Section 8(b)(2)) in violation of this provision. 29 U.S.C. § 158(b)(1)(A), (b)(2). Neither side disputes that in asserting a right not to join the Union Legley was engaging in protected activity. The question is whether Legley was discharged because of his protected activity or for some other, lawful, reason.

## C. Mixed Conduct Cases

Mixed conduct cases confront this very question: was the employee terminated because of his protected conduct or was he terminated for a lawful reason? The decision of the ALJ focused on Legley's actions during the orientation meeting and asked whether they were such as to deprive Legley of the protections of the Act "by virtue of any misconduct on his part." In posing the question this way, the ALJ relied upon the balancing test enunciated in Atlantic Steel, 245 N.L.R.B. at 816. In so doing

-23-

the ALJ misconstrued Atlantic Steel and its applicability to the facts of this case. Atlantic Steel involved an employee who made derogatory comments to his supervisor during a discussion over a grievance regarding the assignment of overtime work. Id. at 814. In resolving the case the NLRB established a framework for evaluating whether an employee "who is engaged in concerted protected activity can, by opprobrious conduct, lose the protection of the Act" and created a balancing test for those situations. Id. at 816. In other words, as applied by the ALJ in this case, the question was whether the employee's conduct was such that it would "compel a conclusion that he lost the protection of the Act." Here the ALJ looked to whether Legley "made any statements that could be construed as being threatening or profane" or "acted in an overly aggressive manner."

Elsewhere, however, the NLRB has asserted that Atlantic Steel is only applicable to employee-employer interactions "rather than to employee-union confrontations." Laborers' Int'l Union of N. Am., 359 N.L.R.B. No. 117, slip op. at 3 n.10 (May 3, 2013). Perhaps for this reason, in reviewing the ALJ's decision, the NLRB shifted the legal terrain and applied three different frameworks: (1) duty of fair representation, (2) the Wright Line test and (3) the Palmer House Hilton scenario.[9] It applied the first two to

_____

[9] The NLRB did not expressly "pass on whether the Atlantic Steel

the Union's actions in allegedly causing Legley's discharge and the latter to Good Samaritan's decision to terminate Legley's employment.

## 1. Duty of Fair Representation

The duty of fair representation refers to the Union's "statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." Vaca v. Sipes, 386 U.S. 171, 177 (1967). This duty applies to all union activity. Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67 (1991). A breach of this duty occurs "only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." Vaca, 386 U.S. at 190. Indeed, the doctrine has its origins in "a series of cases involving alleged racial discrimination by unions." Id. at 177.

The standard is "tripartite," which means that the union activity in question cannot be arbitrary or discriminatory or in

---

framework is applicable." Given its express decision to evaluate this case under alternative frameworks, we will likewise not apply Atlantic Steel, although we note, while the NLRB did not, that this necessarily shifts the focus in this case from the question of 'was the employee's conduct so bad that he could be discharged despite his protected conduct,' to 'what actually motivated the union and the employer in their decision to report or discharge the employee.'

bad faith. O'Neill, 499 U.S. at 77. Union actions are arbitrary "only if [the union's conduct] can be fairly characterized as so far outside a 'wide range of reasonableness,' that it is wholly 'irrational' or 'arbitrary.'" Id. at 78 (quoting Ford Motor Co. v. Huffman, 345 U.S. 330, 338 (1953)). Discrimination refers to racial and gender discrimination as well as other distinctions made among workers, including lack of union membership. Breininger v. Sheet Metal Workers Int'l, 493 U.S. 67, 78 (1989). "A union acts in bad faith when it acts with an improper intent, purpose, or motive," and "[b]ad faith encompasses fraud, dishonesty, and other intentionally misleading conduct." Spellacy v. Airline Pilots Ass'n-Int'l, 156 F.3d 120, 126 (2d Cir. 1998); see also Márquez v. Screen Actors Guild, Inc., 525 U.S. 33, 47 (1998) (finding no bad faith where there was "no intent to mislead"); Mock v. T.G. & Y. Stores Co., 971 F.2d 522, 531 (10th Cir. 1992) ("Bad faith requires a showing of fraud, deceitful action or dishonest action."); Baxter v. United Paperworkers Int'l Union, Local 7370, 140 F.3d 745, 747 (8th Cir. 1998) ("[t]o prove bad faith, [plaintiff] needed to establish the existence of fraud, deceitful action, or dishonest conduct").

In instances where the allegation is that the union caused an employee's discharge, the NLRB has employed a presumption that any such act is itself a violation of Section 8. Int'l Union

of Operating Eng'rs, Local 18, 204 N.L.R.B. 681 (1973) enforcement denied 555 F.2d 552 (1977) ("When a union . . . causes an employee's discharge, it has demonstrated its influence over the employee and its power to affect his livelihood in so dramatic a way that we will infer--or, if you please, adopt a presumption that--the effect of its action is to encourage union membership on the part of all employees who have perceived that exercise of power."). This presumption can be rebutted either by arguing that the union acted pursuant to a union security clause (not at issue here) or through what is referred to as a "necessity defense." Radio-Elecs. Officers Union v. NLRB, 16 F.3d 1280, 1284 (D.C. Cir. 1994). This defense consists of showing that the union's actions were "done in good faith, based on rational considerations, and were linked in some way to its need effectively to represent its constituency as a whole." Operative Plasterers & Cement Masons, Local No. 299, 257 N.L.R.B. 1386, 1395 (1981).

## 2. **Wright Line**

In this case the NLRB applied a second framework for evaluating the Union's conduct, derived from the NLRB's decision in Wright Line. 251 N.L.R.B. at 1083. The question in Wright Line was whether an employee was terminated because of protected conduct or because of his unprotected behavior. The NLRB held that the General Counsel had to make a prima facie showing "that the

employee's conduct protected by § 7 was a substantial or a motivating factor in the discharge." Transp. Mgmt., 462 U.S. at 399-400. This test is satisfied by demonstrating: "(i) the employee's engagement in the protected activity; (ii) the employer's knowledge of that activity; (iii) the employer's antipathy toward it; and (iv) a causal link between the antipathy and the adverse employment action." E.C. Waste, Inc. v. NLRB, 359 F.3d 36, 42 (1st Cir. 2004) (citing Transp. Mgmt., 462 U.S. at 401-3).

The defendant can either rebut this prima facie showing, or it can seek to prove "by a preponderance of the evidence that the discharge rested on the employee's unprotected conduct as well and that the employee would have lost his job in any event." Transp. Mgmt., 462 U.S. at 400. In other words, "proof that the discharge would have occurred in any event and for valid reasons amount[s] to an affirmative defense on which the employer carrie[s] the burden of proof by a preponderance of the evidence." Id.

Wright Line itself did not involve union activity. Rather, it concerned an employer who had terminated an employee for allegedly legitimate reasons. The framework that case established, however, has been applied by the NLRB in cases involving union activity. See Int'l Union, SPFPA, Local 444, 360 N.L.R.B. No. 57, slip op. at 10-11 (Feb. 28, 2014); Teamsters

"Gen." Local Union No. 200, 357 N.L.R.B. 1844, 1852 (2011); Int'l Ass'n of Bridge, Structural and Ornamental Ironworkers, Local 340, 347 N.L.R.B. 578, 579 (2006); United Paperworkers Int'l Union, Local 1048, 323 N.L.R.B. 1042, 1044 (1997).

### 3. **Palmer House Hilton**

The Board cited Palmer House Hilton in upholding the ALJ's determination that "the Employer violated the Act when it discharged Legley." Palmer House Hilton involved an employee who was discharged because he was delinquent in paying his union dues even though he had entered into a payment plan with the union. 353 N.L.R.B. at 852. The Board there held that "[a]n employer violates the Act when it discharges an employee at the request of the union when it has reasonable grounds for believing that the request was unlawful." Id. (citing Valley Cabinet & Mfg., 253 N.L.R.B. 98, 99 (1980), enforced, 691 F.2d 509 (9th Cir. 1982)) (internal citations removed).

Palmer House Hilton and the cases it cites all involved a union request to discharge an employee pursuant to a union security clause. By definition, those cases do not involve a motivation for the employer to discharge the employee other than the union's request. However, the facts of this case are more complicated. Here, Good Samaritan asserts a lawful motivation for the discharge of Legley. That moves this case out of the Palmer

House Hilton line of cases (in which the only motivation is the union request) and into the Wright Line framework (which is focused on determining which motivation, among multiple possibilities, actually led to the employee's discharge). Indeed, the NLRB appears to have recognized this when it found that Good Samaritan "failed to show that it would have discharged Legley in the absence of his protected activity." This is an affirmative defense under the Wright Line analysis, though it has no role to play under the Palmer House Hilton scenario. We therefore find that Good Samaritan's decision to discharge Legley should be evaluated under the Wright Line test, not Palmer House Hilton.[10]

---

[10] In its brief the NLRB suggests that the citation to Palmer House Hilton indicates that the NLRB believed that Good Samaritan had a duty to independently investigate the events that occurred at the orientation. While this argument attempts to rationalize the NLRB's citation to Palmer House Hilton, it puts a characterization on the NLRB's decision that the decision itself fails to support. We will not read into the decision a rule that the decision itself does not clearly articulate. See Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n, 59 F.3d 284, 291 (1st Cir. 1995) (refusing to affirm an agency's change in precedent on a ground not adequately explained); P.R. Sun Oil Co. v. EPA, 8 F.3d 73, 79 (1st Cir. 1993) ("[T]he agency's decision cannot be supported on reasoning that the agency has not yet adopted"). In its brief, the NLRB fails to cite any case in which the NLRB has previously imposed the Palmer House Hilton duty to investigate outside of the union security context. In the absence of a clearer statement to that effect, we will not read such a rule into the NLRB's decision. See Fort Dearborn Co. v. NLRB, 827 F.3d 1067, 1074 (D.C. Cir. 2016)("an unexplained divergence from [the Board's] precedent would render a Board decision arbitrary and capricious").

There is an alternative line of cases that the NLRB could have turned to if its intent was to impose a heightened duty on the employer: NLRB v. Burnup & Sims, Inc., 379 U.S. 21, 23 (1964); Associated Grocers of New Eng., Inc. v. NLRB, 562 F.2d 1333, 1338 (1st Cir. 1977). This line of cases applies where an employee is discharged for unprotected conduct that has not in fact occurred, even though the employer was motivated by the alleged unprotected conduct in discharging the employee. In these cases, the General Counsel has the burden of "affirmatively show[ing] that the misconduct did not in fact occur." Pepsi-Cola Co., 330 N.L.R.B. 474 (2000). The NLRB did not cite this line of cases in its decision, however, suggesting that it perceived the case to fall squarely within Wright Line, and we believe for good reason.[11] The

---

[11] We note that in its briefing to us the NLRB does cite this line of cases in support of its argument that Good Samaritan's "purported 'good-faith belief' that Legley violated the civility policy is no defense." Again, as we stated above with regard to Palmer House Hilton, we will not enforce a Board decision based on reasoning it has not adopted nor explained. See supra n.10; see also Sutter East Bay Hosp. v. NLRB, 687 F.3d 424, 437 (D.C. Cir. 2012) (refusing to uphold NLRB decision as meeting its "analytical burden by simply stating that the application of Burnup & Sims would reach the same conclusion without providing any analysis or explanation"). The NLRB nowhere in its decision states that Legley was not uncivil and the ALJ's evaluations of Legley's behavior were conducted under the heightened Atlantic Steel test (a much different standard than that established by Good Samaritan's civility policy). If the NLRB had intended to base its decision on a finding that Legley absolutely did not engage in any unprotected conduct then it needed to have explicitly said so.

question is whether any conduct at all occurred that could have been interpreted by the employer as a violation of the civility policy. So long as some such conduct occurred, our analysis is squarely within Wright Line, which "is designed to preserve what has long been recognized as the employer's general freedom to discharge an employee 'for a good reason, a poor reason, or no reason at all, so long as the terms of the [Act] are not violated.'" MCPC, Inc. v. NLRB, 813 F.3d 475, 488 (3d Cir. 2016) (citing Meyers Indus., Inc. (Meyers I), 268 N.L.R.B. 493, 497 n.23 (1984)).

Therefore, given the inapplicability of Burnup & Sims, a crucial consideration under the Wright Line analysis is "whether the employer had a good faith belief" that the "employee actually engaged in the misconduct." Sutter East Bay, 687 F.3d at 435. If "management reasonably believed those actions occurred, and the disciplinary actions taken were consistent with the company's policies and practice, then [the company] could meet its burden under Wright Line regardless of what actually happened." Id. at 435-6. The NLRB has itself employed this "reasonableness" test:

> In order to meet its burden under Wright Line, an employer need not prove that the disciplined employee had committed the misconduct alleged. Rather, it need only show that it has a reasonable belief that the employee had committed the alleged offense, and that it acted on that belief when it took the disciplinary action against the employee.

-32-

DTR Industries, Inc., 350 N.L.R.B. 1132, 1135 (2007). The question therefore in analyzing a defense under Wright Line is whether there is a good faith or reasonable belief that the alleged misconduct occurred.

### III. **Analysis**

Applying these principles to the facts of this case, we must ascertain whether there is substantial evidence on the record as a whole to support the NLRB's finding that the Union, in causing Legley's discharge,[12] and Good Samaritan, in discharging Legley, violated Section 8 of the NLRA.

**A. The Union**

The threshold question is whether the Union caused Legley's discharge because of his protected activity, which is evaluated under Wright Line. Only if we find that it did not do so do we need to evaluate whether, nevertheless, in causing his discharge the Union violated its duty of fair representation.

**1. Wright Line**

The entirety of the NLRB's analysis under Wright Line is as follows:

---

[12] The Union argues that in reporting his behavior to the hospital's management it could not have foreseen that Legley would be discharged and therefore cannot be said to have caused Legley's discharge. Because we can resolve this case without having to address this question, we will assume without deciding that the Union's actions caused Legley's discharge.

> The elements commonly required to establish discriminatory motive are established in the record here: Legley engaged in protected activity, the Union had knowledge of that activity, and Lavigne's unlawful threat of unspecified reprisal shows the Union's animus against his protected conduct. We find that the General Counsel met his initial burden, and that the Union failed to meet its rebuttal burden by showing that it would have taken the same action absent Legley's protected activity.

The NLRB's recitation of the facts provides little additional insight. Indeed, it appears to have followed the ALJ's focus on the events at the orientation and given little attention to the Union's decision to report its concern regarding Legley's behavior to Good Samaritan. As noted above, however, this focus on the events of the orientation occurred because of a misapplication of law. The ALJ was applying Atlantic Steel, with its focus on whether the employee's behavior was bad enough to justify discharge. Under the Wright Line analysis, however, our focus is on the motivations behind the Union's decision to report Legley to Good Samaritan. The NLRB's treatment of this decision is cursory at best. Indeed, as such the NLRB includes no discussion of the decision to discuss Legley with Good Samaritan. That decision appears to have unfolded over a series of conversations among the Union workers themselves regarding the events of the orientation, which were followed by two discussions with management concerning those events.

-34-

### a. Legley voluntarily joins to the Union

As an initial matter, at the end of the orientation session Legley, by his own testimony, voluntarily joined the Union. This fact, while relevant to the Union's motivation in discussing the events of the orientation with Good Samaritan, was never discussed by the ALJ or the NLRB.

### b. Intra-Union discussions

The first intra-Union discussion that occurred following the orientation was Lavigne's call to Leveille. The NLRB and the ALJ both summarize this call, as Lavigne reporting "that Legley was mean to her." The characterization of this conversation simply ignores the extensive testimony concerning the call's content. Leveille testified that when Lavigne called "she was choked up, like she was crying," and that she reported:

> I had orientation this morning, and there was a man who came in and he was, you know, he was very intimidating. He started pointing his finger at me and yelling at me, and I couldn't get through everything I had to tell everybody. He kept interrupting me . . . he kept saying that I never met him in the lobby and then he had to climb up the stairs.

Leveille was specifically asked "up to that point [in the conversation], what if anything had she said about the union or about union membership," to which Leveille replied "[n]othing. It was his, you know, when he came in the room and he really just started badgering her about not meeting him in the lobby and then

having to take the stairs . . . she really felt discombobulated because he just kept interrupting her."  Leveille testified that her "impression was that she just got so flustered because he just came in the room and, in her words, he blew up the orientation." Leveille was again asked if "at some point in your conversation with her was there any mention of anything Mr. Legley said about having to join the union or not having to join the union," to which she replied:

> I don't recall.  I mean because that wasn't
> what the conversation was.  She was really
> upset.  I was trying to calm her down because
> she just felt very intimidated by the
> situation that had happened.  I don't even
> recall talking about anything to do with union
> membership, because that wouldn't be
> important.[13]

Although Leveille testified that she thought that the protected statements came up at some point, she stated that her "immediate concern was about [Lavigne's] emotional state.  If he didn't want to join the union, I don't care.  That wasn't of importance." Thus, the characterization that Lavigne called Leveille and reported that Legley had been "mean" fails to discuss the actual content of the call, including the fact that neither of them were

---

[13]  On cross-examination Leveille clarified what Lavigne apparently meant by "intimidating": "Mr. Legley came in the room and was pointing at her, and was using a loud voice, and he was a big man. And it was in that term that he was intimidating, overpowering, taking over the room."

focused on Legley's protected statement and that in fact their primary concern was Legley's behavior, which Lavigne felt had involved a big man with a loud voice, pointing a finger at her and interrupting her so that she could not get through her presentation. All of this is relevant in evaluating the Union's motivation to report Legley's conduct to Good Samaritan and none of it is acknowledged or discussed by the NLRB.

After she spoke with Lavigne, Leveille called Nicholaides. She testified that their conversation concerned how upset Lavigne was and "the fact that isn't it outrageous that someone on their first day of work would act like this." Leveille does not recall discussing Legley's protected statements at all with Nicholaides. Leveille's stated concern at the end of these two conversations was that "I'm going to have to be defending this guy somewhere down the line if he's going to continue to act like this." At no point in this discussion did Leveille or Nicholaides discuss reporting Legley to management.

Lavigne also called Nicholaides. While it is clear that Legley's protected statements came up during this conversation, Nicholaides stated that it was not the questions themselves that upset Lavigne, it was "the mannerism in which he did it." He reported that Lavigne "was extremely upset" when she called him, which he "could hear . . . in her voice."

Following the conversation with Lavigne, Nicholaides called Cadima to ask "her if she could give me any input on what happened." He testified that he "didn't report anything to her," that he called "[b]ecause [Lavigne] was so upset." Cadima told Nicholaides that she was not present during Lavigne's portion of the orientation but that she felt that "[w]e're going to have our hands full with him. He ran us through the ringer." Nicholaides testified that his conversation did not include Legley's protected statements at all because his primary concern was how upset Lavigne was because "it's just not [her] nature to get that upset. And I was very concerned for her when she called -- she sounded over the phone like she was practically in tears."

In the absence of an adverse credibility finding with regard to this testimony, the fair inferences that can be drawn from it must be made. Allentown Mack, 522 U.S. at 378 (holding that the Board "is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands"). Those inferences are that following the orientation meeting, while Leveille and Nicholaides were aware of the protected statements, those statements were not the focus of their concern. Their focus was on how upset Lavigne was, which based on their knowledge of her (Leveille and Nicholaides each testified that they had known

-38-

Lavigne for many years and had never observed her become this upset), supports the Union's contention that it was the level of unsettledness that they observed in Lavigne that motivated their decision to discuss Legley with management, not, in fact, his protected statements.[14]

---

[14] Because <u>Wright Line</u> focuses on the motivation behind the decision this is where we focus our analysis. We note, however, that much of the NLRB decision appears to be based on a belief (seemingly directed by the ALJ's interpretation of Legley's conduct, which we have already noted was guided by the high standard for misconduct established in <u>Atlantic Steel</u>) that because nothing in Legley's conduct was 'that bad,' Lavigne was not justified in being as upset as she was, therefore, the only reason she had for being upset is Legley's protected statements. There are a number of problems with this line of reasoning, however. First, it turns on its head the proper focus of the inquiry. The question is what motivated the Union in reporting Legley's behavior. The seriousness of Legley's conduct is relevant to that inquiry, but it cannot, as it appears to under this line of reasoning, end the inquiry. Moreover, if the NLRB is going to base its finding that the Union violated Section 8 in reporting Lavigne's statements and state of mind following the orientation to management because those statements and state of mind were themselves based solely on Legley's protected conduct, then it needs to have clearly said so. Indeed, as previously noted, it has a line of cases starting with <u>Burnup & Sims</u> that would have guided that analysis. We will not infer such a line of reasoning in the absence of an explicit statement to that effect. Finally, in the absence of such a line of reasoning by the NLRB, its decision reads as though it were itself deciding whether Legley's conduct actually violated the civility policy, deciding that it did not and then deciding that all statements made by Lavigne and the Union therefore had to have been based on a discriminatory motivation. But the NLRB did not make an explicit finding of pretext and the record as a whole does not support such a finding. Additionally, although the NLRB could theoretically have found that none of this contradictory testimony was credible, it did not explicitly make that finding either and nothing in the record demands that we make such an inference.

### c. Union discussion with Legley

On the morning of December 20 Legley discussed the events of the orientation with Jordan, Gerry Monahan (another union delegate who worked in the boiler room) and Nicholaides. According to Jordan, Legley showed up for work and said "[w]e may have a little problem." He said that he "had a disagreement with the girl giving the orientation." Jordan took him to meet with Monahan and Nicholaides. According to Legley, he wanted to "meet with this lady," "shake her hand whatever and settle this." He testified that Nicholaides said "[o]h . . . it's gone way past this . . . [s]he's made complaints about you to the head of the union in Boston. She's made complaints to the head of HR, and she made complaints to personnel, the head of personnel. We don't know what's going to happen." While the NLRB mentions this statement in its recitation of facts, it does not discuss any of the previously mentioned testimony demonstrating that in fact Lavigne had not spoken to the head of the Union in Boston (she only spoke to Leveille who is not the head of the union), had not reported the incident to HR (her only comment was in passing to Cadima leaving the orientation; Cadima is not the head of HR) and there was no allegation that Lavigne complained at all to personnel (again, aside from her passing comment to Cadima). Thus, the NLRB simply restated Legley's allegation of Nicholaides' statement

without provided any of the uncontradicted conflicting evidence that is evident in the record.

### d. Nicholaides speaks to management

The NLRB's treatment of Nicholaides' conversations with management are similarly perfunctory. The NLRB simply states that on December 19 "Nicholaides reported the Legley incident to Brennan and . . . Kenyon," and that at lunch on December 20 Nicholaides "told Patnaude, Kenyon, and . . . Watts that Legley was rude to Lavigne during orientation and had 'negative behavior' during his meeting with him earlier that day." It concludes its recitation of these facts with the ALJ's findings that "Kenyon and Patnaude were aware that Legley had questioned Lavigne about the need to become a member of the Union."

At some point on December 19 Nicholaides may have spoken to either Brennan or Kenyon (he testified that he did not recall speaking to one of them. Kenyon thought that he had heard about what happened from Brennan on December 19). Nicholaides was asked "[i]n fact didn't you tell Mr. Brennan that Legley had told you that he didn't feel that he needed to join the union" to which Nicholaides replied "I never mentioned that. I was told he joined the union, so to me that was a nonissue." Instead, Nicholaides reports the focus of the conversation being the fact that Legley "was very disruptive at the meeting." Nicholaides was again asked

-41-

whether "it was brought up that [Legley] had disagreed with [Lavigne] about whether or not he had to join the union" to which Nicholaides again replied "that was never discussed because I was told he joined the union. . . . I just -- I brought up how disruptive he was at the meeting and how upset he got [Lavigne]."

Nicholaides reports having told management that Lavigne had

> called me up -- I'm not sure how much after the meeting, but she was extremely upset, her voice was shaky, she told me she had never been treated this way before, that he came in right from the get-go complaining that he had to walk up the stairs. He also -- even after all the complaints he -- I can't remember -- yeah, he had to walk up the stairs, no one met him when he first came in, and that he didn't even know if he wanted to work at a place like this.

Nicholaides summarized the conversation as "it was discussed about his behavior at the orientation." Nicholaides made clear in his testimony that he did not remember ever discussing Legley's protected statements with Brennan or Kenyon.

On December 20 Nicholaides again spoke to management, this time Patnaude, Watts and Kenyon together. Patnaude testified that they discussed with Nicholaides "the incidents at orientation, how rude he was to [Lavigne], that he had made her cry she was so upset." She later said, "[Nicholaides] was talking about how upset [Lavigne] was." She also testified that Nicholaides

-42-

had mentioned his discussion with Legley that morning at which "Mr. Legley had said something to the extent of if you guys don't want me here, I'll just go." Kenyon testified that at this meeting Nicholaides raised concerns "around Mr. Legley's behavior" and that "in general" he was "concern[ed] with [Lavigne], the rude and condescending behaviors that were observed."

The only testimony that actually supports the NLRB's assertion that the protected statements were known to management when it made its decision to discharge Legley came from Kenyon, who testified that he knew about them, though he does not say how. Otherwise, the testimony overwhelmingly supports an inference that the Union's discussions with management focused on Legley's behavior, which Nicholaides believed was troubling because it had so upset Lavigne. Moreover, based on his knowledge of Lavigne, he interpreted her level of upset to be directly related to Legley's behavior rather than his protected statements. Thus, the testimony of the relevant parties, i.e., Nicholaides, Patnaude and Kenyon, all support the inference that the focus of the discussions was on how upset Lavigne was and Legley's behavior.

None of this testimony was discussed by the NLRB. It is impossible for us to know whether the NLRB's decision that "the Union failed to meet its rebuttal burden by showing that it would have taken the same action absent Legley's protected activity" is

-43-

based in the record as a whole in the absence of any discussion of the contradictory evidence that is present in the record.  See NLRB v. Int'l Bhd. of Teamsters, Local 251, 691 F.3d 49, 60 (1st Cir. 2012) (failing to find substantial evidence on the record as a whole where the NLRB decision ignored contradictory evidence). The Board

> may not distort the fair import of the record by ignoring whole segments of the uncontroverted evidence; for '[i]t would seem that the purpose of the 'whole record' test is to limit the opportunity for transmuting a preconception into judgment by picking and choosing what will support that preconception and willfully ignoring whatever weighs against it.'

Maine Yankee Atomic Power Co. v. NLRB, 624 F.2d 347, 360 (1st Cir. 1980) (quoting Louis Jaffe, Judicial Control of Administrative Action 607 (1965)).  Ultimately "a decision by the Board that 'ignores a portion of the record' cannot survive review under the 'substantial evidence' standard," particularly where, as here, the Board ignores all contradictory testimony from the Union and management as well as unfavorable testimony by the discharged employee.  Carey Salt Co. v. NLRB, 736 F.3d 405, 410 (5th Cir. 2013) (quoting Lord & Taylor v. NLRB, 703 F.2d 163, 169 (5th Cir. 1983)).  Indeed, the Act itself calls upon the NLRB to base its findings of facts upon a de novo review of the entire record. Standard Dry Wall Products, 91 N.L.R.B. 544, 545 (1950), enforced,

188 F.2d 362 (3d Cir. 1951). This is especially necessary in a case such as this where the NLRB opts for a different legal framework than that employed by the ALJ. In the absence of any indication of a de novo review and in a case such as this where there is significant contradictory evidence that goes unaddressed by the NLRB's decision, we simply cannot uphold that decision as based on substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e).

### 2. Duty of Fair Representation

Because we find that the Union did not cause Legley's discharge because of his protected activity, we must further consider whether, in causing his discharge, the Union violated its duty of fair representation. In its decision the NLRB does not explain what the interaction is, or should be, between the duty of fair representation and Wright Line. Numerous of the NLRB's most recent Section 8(b)(2) cases, rather than providing analysis under the duty of fair representation, focus on Wright Line analysis. Thus, for example, in Int'l Union, SPFPA, the NLRB reasoned that an alleged Section 8(b)(1)(A) violation would be evaluated under the duty of fair representation, which it stated would be breached if the union's "conduct toward a unit employee is arbitrary, discriminatory or in bad faith." 360 N.L.R.B. No. 57 at 9. The NLRB further found that a Section 8(b)(2) violation would be

evaluated under Wright Line.  Similarly, in Teamsters "Gen." Local Union No. 200, the NLRB found that where a violation of Section 8(b)(1)(A) or 8(b)(2) is alleged, and where that "violation turns on motive . . . the Board requires that the charge be analyzed under the framework set out in Wright Line."  357 N.L.R.B. at 1852.  Earlier, in United Paperworkers, the NLRB held that "Wright Line provides the analytical mode and determines the allocations of burdens of proof in all cases of alleged discrimination."  323 N.L.R.B. at 1044.

All of the cases cited above involved allegations that union members were discriminated against because of their protected activity and in each case the Section 8 violation was found because of the protected activity.  There was therefore no need to go any further because no other reason for the discharge was found.  Another line of cases evaluate when the Union causes an employee's discharge for reasons other than protected activity. In its decision below the NLRB points to Operating Engineers. There the NLRB adopted a presumption that "[w]hen a union prevents an employee from being hired or causes an employee's discharge . . . the effect of its action is to encourage union membership on the part of all employees who have perceived that exercise of power."  204 N.L.R.B. at 681.  This presumption can be rebutted by showing that "the union action was necessary to the effective

performance of its function of representing its constituency."

Id. Below, the NLRB concluded that the Union had provided no defense of its actions and therefore did not overcome the presumption that it was in violation of Section 8.[15] This

---

[15] Before this court the NLRB therefore argues that the Union has waived any such defenses. We lack jurisdiction to hear any "objection that has not been urged before the Board, its member, agent, or agency." 29 U.S.C. § 160(e). However, "[t]he specificity required for a claim to escape the ban imposed by [§ 160(e)] is that which will 'apprise the Board of an intention to bring up the question.'" NLRB v. Watson-Rummell Elec. Co., 815 F.2d 29, 31 (6th Cir. 1987) (internal citation omitted) (quoting May Dep't Stores v. NLRB, 326 U.S. 376, 386 n.5 (1945)). "An objection was 'urged before the board' if it was raised with sufficient specificity in briefing prior to the Board's decision, or in a subsequent motion for reconsideration." Int'l Union, United Auto., Aerospace, 844 F.3d 590, at 598-99 (citing Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 665-66 (1982)).

The Union makes numerous arguments in response to the NLRB, including the fact that the ALJ made no mention of the duty of fair representation and it therefore was not required to anticipate a defense to a legal issue that the Board itself raised in the first instance. For our purposes, the deciding factor is that the evidence that the Union presents to this Court in defense of its conduct under the duty of fair representation is the same as that it argued to the NLRB in contending that the ALJ should have applied a Wright Line framework. The NLRB asserts in response that this Court cannot consider the parties' briefs before the NLRB as they are not part of the administrative record. We reject this claim and consider the briefs relevant to resolving this question. The Union's brief below focused almost in its entirety on Legley's unprotected conduct and specifically asserted, inter alia, that had Wright Line been correctly applied the ALJ would have been forced to conclude that in reporting Legley's behavior to Good Samaritan, the Union was motivated by Legley's unprotected conduct rather than his protected statements. Given this argument, we can hardly say that the NLRB did not have an opportunity to consider the Union's arguments presented here under the duty of fair representation that it reported Legley's conduct because it was concerned about his treatment of a fellow worker,

-47-

conclusion, however, was not based on substantial evidence on the record as a whole given that the Union did argue that it reported Legley's behavior because of its belief that he had mistreated one of its members.

The question the NLRB should have evaluated was whether this justification is sufficient to support the Union's actions under the duty of fair representation. The dissent argues that by citing to Operating Engineers and the "necessity defense," in its decision, the NLRB was signaling a desire to adopt the seemingly onerous showing required by that case, and would remand to the NLRB to determine whether the Operating Engineers standard has been met in this case. In making this argument we believe the dissent is articulating a rationale for the NLRB's decision that the NLRB itself has not made. This is significant because the NLRB cannot depart from its own precedent unless it articulates reasons for the departure. Shaw's Supermarket, 884 F.2d at 36-37. Instead, we find that the NLRB's more recent cases interpreting the threshold of what is required by the Union to rebut the presumption established in Operating Engineers lower the

---

which report was in furtherance of its duty to represent the needs of its constituency as a whole. The real issue, it seems to us, is that the NLRB failed to consider the record as a whole and therefore assumed that the reason the Union reported Legley to management was because of his protected conduct.

rebuttal burden required by the Union and that the Union's stated justification for reporting Legley easily meets this standard.

For example, in Operative Plasterers the NLRB, citing Operating Engineers, summarized both the presumption and the resulting standard to rebut that presumption as:

> not only that a union may not take action impairing a represented employee's job tenure or prospects based on arbitrary, unfair, irrelevant, or invidious considerations, but also that the union bears the practical affirmative burden of justifying virtually any such 'impairment' action by showing that its action was taken to fulfill its overriding duty to represent the legitimate interests of its constituency.

257 N.L.R.B. at 1395. This latter requirement can be met when the Union shows that its actions were "done in good faith, based on rational considerations, and were linked in some way to its need effectively to represent its constituency as a whole." Id. Shortly after Operative Plasterers, the NLRB further clarified that the union could rebut the Operating Engineers presumption "by evidence of a compelling and over-riding character showing that the conduct complained of was referable to other considerations, lawful in themselves, and wholly unrelated to the exercise of protected employee rights or to other matters with which the Act is concerned." Glaziers Local Union 558, 271 N.L.R.B. 583, 585 (1984), enforcement denied on other grounds, 787 F.2d 1406 (1986) (quoting Carpenters Local 1102, 144 N.L.R.B. 798, 800 (1963)).

-49-

The Operative Plasterers formulation was cited by the NLRB in its most recent case on point, Caravan Knight Facilities Mgmt., Inc., 362 N.L.R.B. No. 196, slip op. at 5 (Aug. 27, 2015), enforcement granted in part and denied in part sub nom., Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. NLRB, 844 F.3d 590 (2016). There the NLRB found that the Union acted in good faith and had a rational and legitimate interest, "consistent with its duty to represent all unit employees," in reporting an employee's threat to fight with other employees. Id. at 6.

The Union asserts that it had a rational reason based on good faith to report Legley's behavior -- namely that it was concerned about his treatment of a fellow employee and union member. We find that this reason easily meets the standard established by Operative Plasterers and Caravan Knight. The actions were taken in "good faith, based on rational considerations" and the Union had a valid interest in ensuring that someone abusing employees be reported to the employer for the protection of its own fellow members. Operative Plasterers, 257 N.L.R.B. at 1395.

The other cases cited by Caravan Knight similarly employ an expansive definition of what counts as "necessary" to include anything in which the Union has a "legitimate interest . . . consistent with its duty to represent all unit employees." 362

N.L.R.B. No. 196 at 6 (citing Acklin Stamping, 355 N.L.R.B. 824, 825-26 (2010) and Graphic Communc'ns Local 1-M (Bang Printing), 337 N.L.R.B. 662, 674 (2002)).  Given this line of cases and given that "an unexplained divergence from [the Board's] precedent would render a Board decision arbitrary and capricious," we will not assume that the Board intended to revert to a heightened standard under Operating Engineers absent a clear statement by it to that effect.   Fort Dearborn, 827 F.3d at 1074; see also Shaw's Supermarket, 884 F.2d at 36-37.

Before us now the NLRB makes three arguments to support its contention that the Union has not met its rebuttal burden under the duty of fair representation.  First, it argues that Legley was not uncivil, therefore it was unnecessary to report his conduct to management.  Second, it argues that Legley's protected conduct was mentioned "at every step of the discussion" both among union delegates and with Good Samaritan, which it suggests indicates that Lavigne's "well-being" was not the Union's primary concern. Third, it argues that Nicholaides's report of Legley's statement that 'maybe this isn't the best fit for me' indicates that the Union had a motivation other than protecting its members from uncivil conduct.

We find none of these arguments persuasive.  With regard to the first argument, we have already stated that the NLRB failed

to analyze this case under Burnup & Sims, therefore there cannot be an allegation that no unprotected conduct occurred. Instead, the question of how uncivil Legley actually was in his behavior can only be relevant in evaluating whether the Union was acting in good faith in reporting his behavior to management, but we are not tasked with determining for ourselves whether Legley was sufficiently uncivil as to merit dismissal under Good Samaritan's code of conduct. In reviewing the Union's statements to management (outlined above) we fail to find substantial evidence that the Union was deliberately misleading in reporting Legley's behavior to management, Screen Actors Guild, 525 U.S. at 47, nor that they were deceitful or dishonest, T.G. & Y. Stores, 971 F.2d at 531; United Paperworks, 140 F.3d at 747.

The NLRB additionally cites the fact that Legley's protected statements were mentioned in discussions of his unprotected conduct. However, as examined above, a full review of the record gives no indication (much less substantial evidence to support) that Legley's protected statements were mentioned at every stage, either among the Union members or in discussions between the Union and management. Leveille testified that she did not discuss the protected statements with Nicholaides; Nicholaides testified that he did not mention the protected statements to Cadima; and all reports of Nicholaides's conversations with

-52-

Patnaude, Watts and Kenyon focused on Legley's behavior rather than his protected statements. While it is Kenyon's testimony that he knew about Legley's protected statements, there is actually no testimony supporting the NLRB's assertion that Legley's protected and unprotected conduct were consistently discussed together.

Finally, given all of the above, we find Nicholaides' report of Legley's negative attitude (his statement that maybe Good Samaritan was not a good fit for him) to be of little consequence. There is not substantial evidence to support a conclusion that it motivated the Union's decision to discuss Legley's behavior with management in the first instance, and it does not seem to have played a central role in management's decision to discharge him.

We therefore find that the Union's report of Lavigne's level of upset following the orientation meeting does not rise to the level of being either arbitrary, discriminatory, or in bad faith and that it has cited a valid "necessity" defense in reporting to management what it believed happened at the orientation meeting. There is no allegation that Lavigne was not, in fact, in tears following the orientation. In communicating this fact to management, the Union had a legitimate consideration, one employee's mistreatment of another, relevant to its

representation of its constituency as a whole.  The NLRB conducted

no analysis under this framework and failed to discuss any of the

contradictory evidence supporting the Union's assertion that it

believed it necessary to report Legley's behavior to management.[16]

**B. Good Samaritan**

As noted above, having determined that the Wright Line

analysis applies in situations such as this, where the question of

motivation is central to the analysis, we must determine whether

the NLRB has provided substantial evidence that Legley's protected

conduct was a motivation in Good Samaritan's decision to discharge

him.  Moreover, the question is whether Good Samaritan had a

reasonable belief that the alleged misconduct occurred. Sutter

East Bay, 687 F.3d at 435.  Discovering significant contradictory

evidence that the NLRB failed to consider, we again find that it

has not based its decision on substantial evidence on the record

as a whole as required by the Act.  29 U.S.C. § 160(e).

While both the ALJ and the NLRB in its arguments to this

court treat the question of whether Legley was in fact sufficiently

uncivil as to merit being discharged as central to their

---

[16] Because we believe that it had all of the evidence and arguments
it needed in order to articulate a contrary position and, if it
actually intended to take such a position, neglected to do so
because of its failure to consider the record as a whole, we
decline the dissent's invitation to remand to the NLRB for
reconsideration.

determination of the case, this focus is misplaced and is based in the ALJ's misapplication of Atlantic Steel. Given that there has been some unprotected conduct,[17] then the question of whether the employee's conduct merits discharge becomes the sole provenance of the employer, because the decision to employ a given individual belongs solely to the employer. MCPC, Inc., 813 F.3d at 488; Meyers I, 268 N.L.R.B. at 497 n.23. This is because, as a probationary employee, Legley was essentially at-will, and Good Samaritan could discharge him for any reason at all so long as it was not on account of his protected conduct. The central question is thus Good Samaritan's motivation in actually discharging him, not the ALJ's, NLRB's or even our evaluation of whether we believe that his behavior constituted a violation of the civility policy or whether he should have been kept on as an employee. See Epilepsy Found. of Ne. Ohio v. NLRB, 268 F.3d 1095, 1105 (D.C. Cir. 2001) ("The Board does not have authority to regulate all behavior in the workplace and it cannot function as a ubiquitous

---

[17] As stated above, the NLRB's decision indicates that it opted against applying Burnup & Sims, 379 U.S. 21. Thus, the level of Legley's incivility is only relevant in evaluating Good Samaritan's motive. It would be difficult for the NLRB to allege that there has been no unprotected conduct at all. Derby described an escalation in Lavigne's and Leveille's interaction, including a raising of voices and a number of non-protected behaviors were cited by other witnesses as contributing towards their negative perception of Legley, including being generally difficult.

'personnel manager,' supplanting its judgment on how to respond to unprotected, insubordinate behavior for those of an employer.").

The decision to discharge Legley was made at a luncheon on December 19. Patnaude and Kenyon were the only two individuals who testified to that conversation. Patnaude does not mention Legley's protected comments as having come up at all in the decision to discharge him. Indeed, Patnaude was specifically asked if they would have fired him if Lavigne had lied to Legley (presumably in telling him that he had to join the Union), and Patnaude replied that "[i]t was not the question that he asked, it was how he asked it and that he was badgering her." Kenyon testified that Legley's protected statements had no impact on the decision to discharge him and that his concern was that he did not want "to put time into somebody, make an investment, and hav[e] to deal with those issues right out of the gate." The issues he identified were:

> [Patnaude] had mentioned even during her interview process, she had concerns at that time. Also in that conversation, it came out about a report from employee health about how difficult Mr. Legley had been at employee health. In that conversation, it also came out about how difficult Mr. Legley had been during orientation and that came up through [Nicholaides], through [Lavigne], I believe. And [Cadima] from orientation had observed how upset [Lavigne] was.

Finally, the ALJ and the NLRB each dismissed as irrelevant Legley's behavior on December 5 when he went to human resources to fill out paperwork. However, as the previous quote indicates, it clearly colored how Patnaude and Cadima interpreted Lavigne's and Nicholaides' reports concerning the orientation. Moreover, it had an impact on the overall decision to discharge Legley given Patnaude's statements to Watts and Kenyon that she had not wanted to hire him in the first place.

As an initial matter, it is not clear to us that the General Counsel met his burden in demonstrating that Good Samaritan's antipathy towards Legley's protected activity was a motivating factor in its decision to discharge him. Returning to the Wright Line test, prongs one and two are easily met (Legley engaged in protected conduct and Kenyon admitted knowing about it), but the NLRB did not specify what facts it relied upon to determine that prongs three and four were met (the employer's antipathy toward the protected activity and the causal link between that antipathy and the decision to discharge). The situation in this case is far different from that found in other of our cases, such as E.C. Waste where the company had a "litany of generalized section 8(a)(1) violations" making the company's animus "seem[] evident." 359 F.3d at 43. In its decision the NLRB does not specify what facts support a finding of animus. Instead, it simply

finds that "the Employer learned of Legley's protected conduct at or near the same time as the Union's effective request that he be disciplined for that conduct." In so stating, the NLRB's decision is effectively stating that knowledge of protected conduct followed by an adverse employment decision suffices to demonstrate a potential violation of Section 8.

In its briefing to us the NLRB provides an additional factor supporting animus, asserting that the timing of Legley's discharge is circumstantial evidence of animus. However, in making this point it cites E.C. Waste where the firing occurred "in the critical interval between the time that the Union filed its petition for recognition and the planned presentation election," making the "probative value" of the timing "obvious." 359 F.3d at 43. Here the probative value of the timing is far from obvious given that the protected and unprotected conduct occurred at the same time. In the absence of any other proffered evidence of animus, it is not obvious to us that the NLRB has demonstrated substantial evidence that the General Counsel met his prima facie burden connecting the adverse employment decision to antipathy towards the protected conduct.

Even if the General Counsel had made such a showing, however, we do not believe that the NLRB has established substantial evidence on the record as a whole that Good Samaritan

would not have made its decision to discharge Legley despite the protected activity.  It is true that

> [e]ven if the employer proffers a "seemingly plausible explanation," the Board need not accept such an explanation at face value. Rather, "[i]f the Board supportably finds that the reasons advanced by the employer are either insufficient or pretextual, the violation is deemed proven."

Hosp. Cristo Redentor v. NLRB, 488 F.3d 513, 518 (1st Cir. 2007) (internal citations omitted) (quoting E.C. Waste, 359 F.3d at 42 and Holsum De Puerto Rico, Inc. v. NLRB, 456 F.3d 265, 269 (1st Cir. 2006)).  Here, the NLRB simply stated that Good Samaritan failed to prove that it would have discharged Legley in the absence of his protected activity.  At most this can be read to assert that Good Samaritan's proffered reasons for discharging Legley were insufficient.  Such a finding is not supported by substantial evidence on the record as a whole, however, given all of these statements from individuals involved in the decision to discharge Legley, all of whom stated that their only concern was Legley's apparently difficult interactions with numerous Good Samaritan employees.  In the absence of an adverse credibility finding or a finding of pretext, the fair inference to be drawn from these statements is that Good Samaritan discharged Legley because of how it reasonably perceived his behavior not because of his protected conduct.

## IV. <u>Remaining Issue</u>

Having thus resolved the central issues in this case, we are left holding one piece of the puzzle. The NLRB additionally found that the Union threatened Legley with unspecified reprisals when Lavigne requested information on which department Legley would be working in and then stated "that she knew the people that worked down there, and she was going to warn them that he was coming, and that they would not put up with him." The NLRB does not actually state its reasons for concluding that Lavigne's threat was an "unlawful threat of unspecified reprisal." The ALJ was similarly circumspect, merely stating that he construed Lavigne's statement "as [a] threat of unspecified reprisals."

### A. Legal Framework

As stated above, Section 8(b)(1)(A) "makes it an unfair labor practice for a labor organization or its agents to restrain or coerce employees in the exercise of rights protected by the Act." <u>Int'l Bhd. Of Teamsters, Local 391</u>, 357 N.L.R.B. No. 187, slip op. at 1 (2012). Threats have been interpreted to constitute restraint or coercion within the meaning of the Act. <u>NLRB</u> v. <u>Unión Nacional de Trabajadores</u>, 540 F.2d 1, 7 (1st Cir. 1976). The question is whether the statement's "natural tendency . . . is to deter the exercise of [Section] 7 rights by the employees who either witness it or learn of it." <u>Id.</u> "It is the coercive

tendency of [the] statements, not their actual effect, that constitutes a violation of the Act." NLRB v. Marine Optical, Inc., 671 F.2d 11, 18 (1st Cir. 1982). The threat must be connected to an employee's exercise of Section 7 rights. Amsted Indus., 309 N.L.R.B. 860, 862 (1992).

## B. Analysis

Neither the ALJ nor the NLRB cite an evidentiary basis for their finding that Lavigne's threat was unlawful. The strongest support for an interpretation of the statement as a threat comes from the testimony of Derby who stated that after Legley asked to make copies Lavigne asked where Legley would be working and made the statement that she was going to warn them that he was coming and they would not put up with him down there. Derby testified that she was "pretty horrified" by this statement and took it to be "a threat." In describing their demeanor at this time Derby described it as "escalating" and they both seemed "irritated." While Derby's testimony thus establishes a perception that the statement is threatening, it does not answer the question of whether the threat was connected to Legley's protected statements. Indeed, the proximate cause of the statement appears to have been Legley's interruption to request to photocopy all of the documents. Derby's testimony simply does not resolve the question before us because in order to be unlawful the threat has

-61-

to be directed at the exercise of Section 7 rights rather than unprotected conduct, and Derby's testimony does not establish that nexus. Amsted Indus., 309 N.L.R.B. at 862.

The Union points to Lavigne's conversations following the orientation to demonstrate that what upset Lavigne and what was the source of her statement was not Legley's protected statements, but rather his conduct and behavior throughout the orientation. It argues that this supports the inference that what Lavigne was saying "they" would not put up with had nothing to do with his statements that he did not have to join the Union but with what she perceived to be his rude behavior.

Although this question is a much closer one, we again find that where the Board's decision "ignores a portion of the record" it cannot survive review under the "substantial evidence" standard. Lord & Taylor, 703 F.2d at 169. Again, there simply is not "substantial evidence on the record considered as a whole" that Lavigne's statement was specifically directed at Legley's protected statements rather than at his unprotected conduct. 29 U.S.C. § 160(e). Given the NLRB's failure to discuss any of Lavigne's post-orientation conversations, all of which focused on Legley's conduct rather than his protected statements, we cannot find substantial evidence that at the time the statement was made

Lavigne's primary concern was Legley's assertion of his right not to join the Union.

## V. Conclusion

For the foregoing reasons the petitioners' requests for relief are **granted**, and the NLRB's application for enforcement of its order is **denied**.

**Enforcement denied**.

**"Concurring in part and Dissenting in part opinion follows"**

**BARRON**, <u>Circuit Judge</u>**, concurring in part and dissenting in part.** I join this excellent opinion in all respects except for the conclusion that the Union has met its burden to show that it did not commit an unfair labor practice in causing Good Samaritan to effect the discharge of one of its employees, Camille Legley. To explain my reasons for dissenting on this issue, it helps to step back from the facts of this case, messy as they are, in order to consider the broader legal context in which it arises, complicated though it is. Doing so reveals, in my view, why we are not in a position to deny enforcement at this stage and why, instead, the proper course is to vacate and remand to the Board for a more fulsome explanation of the grounds for its ruling.

## I.

The Board made clear in <u>Wright Line, a Div. of Wright Line, Inc.</u>, 251 N.L.R.B. 1083 (1981), that, if an employer discharges an employee, and the Board can make a prima facie showing that the employee's protected conduct -- that is, conduct protected by section 7 of the National Labor Relations Act ("NLRA" or the "Act"), 29 U.S.C. § 157 -- was a "motivating factor" for the discharge,[18] then the employer will be presumed to have

---

[18] Section 7 provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection,

-64-

committed an unfair labor practice, under section 8(a)(3) of the Act.[19]  Id. at 1089.  The Board has also made clear that, in order to rebut that presumption, an employer has the burden of showing that it would have discharged the employee, even in the absence of the employee's protected conduct, on the basis of a legitimate business reason.  Id.

Under Board precedent, it is equally clear that a union that causes an employer to effect the discharge of an employee may be deemed to have committed an unfair labor practice, under section 8(b)(2),[20] if the union did so because of the employee's section 7-protected activities.  For, just like an employer, a union has

---

and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title."  29 U.S.C. § 157.

[19]  Section 8(a)(3) provides: "It shall be an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term of condition of employment to encourage or discourage membership in any labor organization."  29 U.S.C. § 158(a)(3).

[20]  Section 8(b)(2) provides: "It shall be an unfair labor practice for a labor organization or its agents . . . to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership."  29 U.S.C. § 158(b)(2).

special power in the workplace. Therefore, a union must show that its reasons for causing the employee's discharge were not aimed at wrongly leveraging that power by, say, using the union's ability to cause the employer to take action against an employee who had spoken out against the union because of that speech. The test that the Board uses to determine if the union had an improper motive in causing the employer to discharge an employee is the same Wright Line test that the Board applies to employers. See Freight, Constr., Gen. Drivers, Warehousemen and Helpers, Local Union 287, 257 N.L.R.B. 1255 (1981).

But, significantly for present purposes, the motive-based test set forth in Wright Line is not the only one that the Board has applied to determine whether a union has violated section 8(b)(2) of the Act and thus committed an unfair labor practice by causing an employer to discharge an employee. The Board has also subjected unions -- in certain circumstances -- to an additional measure of scrutiny beyond that mandated in Wright Line. And here is why.

The Board has recognized that a union, unlike an employer, may have a separate and special obligation -- known as its duty of fair representation. Vaca v. Sipes, 386 U.S. 171, 176 (1967). This duty arises when the union has been designated the "exclusive bargaining representative" of employees in a particular

bargaining unit -- that is to say, when a union has obtained "statutory authority to represent all members of a designated unit," not just those within the bargaining unit who have opted to join the union. Id.

Pursuant to that duty, a union must "serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." Id. Thus, the Board has made clear that, in assessing whether a union, in causing an employer to discharge an employee that the union represents, has committed an unfair labor practice, it is critical to take account of how that union conduct looks in light of what may be a particular union's special duty of fair representation. Caravan Knight Facilities Mgmt., Inc., 362 N.L.R.B. No. 196, slip op. at 4 & n.10, 2015 WL 5113236 (Aug. 27, 2015).[21]

Deciding just what it would mean to take account of the duty of fair representation in evaluating the conduct of a union in causing an employer to discharge an employee represented by the union is critical to the proper disposition of this case. In fact, it is the way in which the majority treats the Board's manner

---

[21] To be clear, the Board in these cases does not charge the union with breaching the duty of fair representation. Rather, the Board simply takes account of the duty of fair representation in determining whether an unfair labor practice was committed.

of taking account of that duty that causes me to dissent. But, before saying more about why I disagree with the majority in this regard, it first makes sense to turn back to the case at hand to explain how this issue arises here, as the issue concerning the application of the duty-of-fair-representation framework comes to us in a most complicated fashion.

## II.

As an initial matter, I am convinced that, in this case, the record supports the Board's conclusion that the Union did cause the employer to discharge the employee in question, Legley. Thus, the Board quite rightly did evaluate whether the Union's conduct in having Legley fired constituted an unfair labor practice.

Moreover, while the Board applied the Wright Line test to determine whether the Union committed an unfair labor practice by causing the employer to discharge Legley, I agree with the majority that the Board erred in applying that test. In my view, the record simply does not provide sufficient support for the Board's conclusion that, under that test, the Union committed an unfair labor practice.

The Board concluded that the Union was motivated by animus against Legley's protected conduct. But, as the majority describes, the record as a whole does not contain substantial evidence to support that conclusion. The record evidence at most

shows that the Union was motivated by Lavigne's distress at Legley's disruptive behavior during a meeting in the workplace rather than by Legley's protected conduct -- namely, any arguably anti-union sentiments he expressed at that time. Thus, if Wright Line alone provided the test for assessing whether the Union committed an unfair labor practice, the Board's ruling against the Union could not be sustained.

But, as the majority acknowledges, the Board did not only apply the Wright Line test in evaluating whether the Union's conduct in causing the employer to fire Legley constituted an unfair labor practice. The Board also separately evaluated the Union's conduct under the duty-of-fair-representation framework. And, in doing so, the Board determined that, under that framework, too, the record showed that the Union's conduct amounted to the commission of an unfair labor practice.

In consequence, in order to decide whether the Board's decision may be affirmed, we must decide whether the record evidence that supports the conclusion that the Union was motivated only by Lavigne's distress at Legley's disruptive behavior and not by the Union's desire to retaliate against Legley for his protected conduct is enough to satisfy the Union's burden under the duty-of-fair-representation framework, just as it is clearly enough to satisfy the Union's burden under the Wright Line test. For if

such evidence is also enough to satisfy the Union's burden even under that separate framework, then the Board's ruling in this case cannot be upheld.

In considering this issue, it is important to note at the outset that there is no question but that the Board was right to undertake the additional scrutiny of the Union's conduct that is required under the duty-of-fair-representation framework. After all, in this case, the Union did have that special duty of fair representation. It is the exclusive bargaining representative for the bargaining unit that Legley, the discharged employee, joined. And so, under Board precedent, the Board was obliged to take account of that duty in assessing the propriety of the Union's action in causing Legley's firing. Nor does the Union contend otherwise.

The question, then, is simply whether the Board properly took account of that special duty of the Union here. The answer to that question depends, at least initially, on understanding how the Board determined that the Union acted improperly in light of its duty of fair representation. Did the Board do so simply by redundantly applying a test that amounted to the motive-based Wright Line test, in which case the Board's finding of an unfair labor practice could not be affirmed under the duty-of-fair-representation framework any more than it could be affirmed under

Wright Line itself?  Or, did the Board instead apply a different test that, precisely because of the Union's special duty of fair representation, focused less on motive and thereby imposed a different burden on the Union to show that it acted properly in causing the employer to discharge Legley?  And, if the Board did apply a different test, just what did the Union need to show in order to satisfy it?

The natural place to look to find answers to these questions, of course, is in the Board's decision in this case. But, because my divergence from the majority on this issue concerns, in large part, the proper reading of the Board's decision, I think that, before diving in and parsing precisely what the Board said on that score, it helps to keep in mind that, as a matter of policy, the Board might well want the applicable test under the duty-of-fair-representation framework to be different from the one set forth in Wright Line.

To see why the Board might want that test to be different, consider that it is hardly unusual for employers to decide that an employee must be discharged when there is a good business reason to do so.  In light of that fact, one can understand why there might be no reason for the Board to be concerned about the effect that an employer's discharge of an employee may have on a workplace if the employer can prove that

the discharge was motivated by some reason unrelated to the employee's protected conduct -- notwithstanding that the employee had engaged in protected activity under the Act. After all, the Board may not wish to second-guess the employer's business judgment in firing an employee once it is convinced that the employer acted against that employee for a reason unrelated to employee conduct protected by federal labor law.

In accord with this logic, Wright Line permits an employer to rebut the presumption that it committed an unfair labor practice in firing an employee who had engaged in protected conduct, so long as the employer can show that it acted on the basis of a bona fide reason, unrelated to the employee's protected conduct, in firing that employee. In other words, under Wright Line, the strength of the employer's business justification is not independently subject to scrutiny. What matters is simply whether a business justification was the actual justification.

When a union that is subject to the duty of fair representation takes action to cause an employee to be fired by an employer, however, there might be reason for the Board to pursue a distinct line of inquiry into the union's conduct -- and one that is less focused on ferreting out the motive the union had for going after the employee. In the normal course, after all, one might not expect a union to be seeking to fire the workers that it

-72-

has a special duty to represent fairly. Thus, when a union does engage in the unusual behavior of taking steps to get an employer to fire an employee that the union is obliged to fairly represent, the Board might well be concerned about whether the union's action constitutes an unfair labor practice, notwithstanding that the union was not motivated by an intent to retaliate for the employee's protected conduct.

Specifically, the Board might be concerned about the effect on the employees that the union represents of the union's unusual actions in targeting one of those employees for discharge. The Board might thus require that the union have an especially good reason for seeking the employee's discharge. Only then, the Board might conclude, would it be clear that the union's action did not -- even if only unintentionally -- represent an intimidating and thus impermissible display of union power.

Indeed, the Board explained this reasoning in an early one of its precedents -- Int'l Union of Operating Engineers, Local 18, 204 N.L.R.B. 681 (1973) -- which the Board has subsequently made clear involved the Board's application of the duty-of-fair-representation framework to assess whether a union had committed an unfair labor practice in adversely affecting the employment opportunities of those it represented. See Caravan Knight, 362 N.L.R.B. No. 196, slip op. at 4 & n.10. And, in setting forth its

reasoning, the Board did adopt a test for determining whether the union committed an unfair labor practice that is quite different from Wright Line.

The Board did so by stating first that, where a union prevents an employee it represents from being hired, or causes the discharge of an employee it represents, that action "encourage[s] union membership on the part of all employees who have perceived that exercise of power," and thus is presumptively an unfair labor practice. Operating Eng'rs, 204 N.L.R.B. at 681. The presumption reflected the Board's concern that a union's causing an employer to take an adverse action against an employee that it represents might intimidate other employees into being more supportive of the union than they would otherwise be. The Board then explained that this presumption can be rebutted only by the union showing either that the "interference with employment was pursuant to a valid union-security clause," or "in instances where the facts show that the union action was necessary to the effective performance of its function of representing its constituency." Id. (emphasis added).

In other words, the Board did not focus simply -- as Wright Line did -- on whether the union was motivated by the employee's protected conduct. Instead, the Board also looked independently at the strength of the union's interest in acting as it did.

-74-

The facts of Operating Engineers are also illuminating, as they reveal how demanding this non-motive-based test is. In that case, an employee had engaged in offensive conduct at the union hiring hall and had acted disruptively in a union meeting. On that basis, the Board found, the union denied him his normal seniority on a hiring hall referral list and thereby prevented him from being hired by the employer. Id. But, even though the Board did not dispute that the union took that action in consequence of the disruptive conduct of the employee in union settings and not because of any protected conduct by the employee, the Board still found that the union committed an unfair labor practice. Id.

The Board pointed out that the union had options short of preventing the employee's hiring to redress the problematic conduct of the employee in union settings, including by imposing internal union discipline in the form of fines or suspensions. Id. at 681-82. Thus, the Board was concerned by the fact that the union, rather than availing itself of these seemingly more proportionate responses tied to the union's own effective functioning, had instead acted to adversely impact the employment opportunities of the employee -- notwithstanding the union's duty of fair representation. In consequence, the Board stated that the union committed an unfair labor practice because "while the evidence proffered here might indeed show that the Union had no

-75-

intent to encourage union membership by interfering with Murphy's employment, yet the display of union power exhibited by an exercise of control over employment opportunity solely for reasons relating to the conduct of an employee as a union member would necessarily have that effect." Id. at 682 (emphasis in original).

In sum, in Operating Engineers, the Board appeared to reject under the duty-of-fair-representation framework the very kind of showing that the Union makes here with respect to the firing of Legley, and that we agree satisfies the Wright Line test -- namely that the Union was motivated to take action against him by his disruptive behavior and not by his protected conduct. For, in Operating Engineers, the Board found the union committed an unfair labor practice in seeking to get the employer to take adverse action against the employee it represented, even though the Board agreed the union was not motivated to take action against the employee by that employee's protected conduct. And Operating Engineers reached that conclusion because the union's actions were not necessary to its functioning, and thus had an intimidating effect on the other employees, whom the union was duty-bound to fairly represent.

### III.

Against this background, it is no surprise to me that when we turn to the particulars of the Board's decision in this

case regarding its application of the duty-of-fair-representation framework, we do find what seem to me to be strong signals that the Board applied a different test from Wright Line. And, in fact, we find what seem to me to be very strong signals that the Board applied the very test that I have just described the Board as having set forth in Operating Engineers -- in other words, a test that zeroes in on the degree to which the union's action was necessary (or proportionate) to the union's interest in ensuring its own effective functioning, rather than on whether the union's action was motivated by a desire to punish the employee for having engaged in protected conduct.[22]

The first of these signals appears in a footnote to the Board's decision in this case. There, the Board explained that it has in the past "characterized the union's rebuttal burden under the duty-of-fair-representation framework in different ways." The Board then set out two formulations. The first formulation was that the union must show that its "action was necessary to the effective performance of its constituency" -- a showing about the importance of the union's interest -- for which the Board cited

---

[22]  I note in this regard that the Board has never held that actions by a union that do not constitute unfair labor practices under the Wright Line test therefore also do not constitute unfair labor practices under the duty-of-fair-representation framework. Rather, the Board has consistently applied the tests in parallel.

Operating Engineers.  The second formulation was that the union

must show "the conduct complained of was referable to other

considerations, lawful in themselves, and wholly unrelated to the

exercise of protected employee rights or other matters with which

the Act is concerned," for which the Board cited Glaziers Local

Union 558, 271 N.L.R.B. 583, 585 (1984).  And while the Glaziers

formulation may sound like one that, like Wright Line, is oriented

around the union's motivation in causing the employer to effect a

discharge of the employee, the context of the case reveals the

formulation is actually, like Operating Engineers, setting forth

a test for scrutinizing the importance of the union's interest.[23]

---

[23]  In Glaziers, a union staged a walkout to attempt to get the
employer to replace one class of employees, so-called permit
workers, with another, journeymen.  Glaziers, 271 N.L.R.B. at 586.
The Administrative Law Judge applied the very same test set forth
in Operating Engineers and determined that the Union did not commit
an unfair labor practice under the duty-of-fair-representation
framework because it had staged the walkout without any intention
to advantage union over non-union workers, even though the
journeymen were union members and the permit workers were not.
Id. at 596.  Rather, the ALJ found, the union had simply sought
to enforce a traditional labor practice known as "bumping," which
would give preference in hiring to the more experienced journeymen
over the less experienced permit workers, regardless of their union
or non-union status.  Id. at 596-97.  And the ALJ determined that
the union's interest in promoting the traditional hiring practice
redounded to the benefit of all the workers represented by the
union and thus qualified as an interest sufficiently tied to the
union's effective functioning to satisfy Operating Engineers.  Id.
The Board then reversed, but not because it found that the union's
true interest in promoting bumping was to favor union members over
non-union members.  Id. at 585-86.  Rather, the Board simply
determined that the union failed to demonstrate that its interest
in promoting bumping was actually one that was "sufficient" to

-78-

Thus, both of these formulations are concerned with the importance of the union's interest when the union acts to cause the employer to discharge an employee that the union represents. So, the Board clearly seems to understand the test under the duty-of-fair-representation framework to be -- whatever its precise content -- a distinct one from the motive-based test of Wright Line, a case that, as I noted at the outset, did not even involve a discharge precipitated by the actions of a union that was subject to the duty of fair representation.

The second of these signals appears in the Board's application of the duty-of-fair-representation framework in this case. The Board, in actually evaluating whether the Union met its evidentiary burden under that framework, stated that the Union "[did] not contend that the discharge [of Legley] was necessary to the effective performance of its function of representing its constituency." Thus, the Board used the very formulation that Operating Engineers set forth -- and not the alternative formulation in Glaziers that the Board had also mentioned in the footnote, which, in any event, was itself a case involving the application of the test set forth in Operating Engineers.

justify the targeted walkout even if was not an interest rooted in the aim of favoring union members because the practice of bumping had "no objective basis" and was not a practice the employer was legally obliged to follow. Id. at 586.

Consistent with my conclusion that the Board in this case applied the "necessary" test from Operating Engineers, the Board's counsel states in its brief to us that the Board did just that. And, further, the Union never directly disputes that the Board did so.

Thus, it would appear that, as the case comes to us, the Board determined that, in order for the Union to meet its burden under the duty-of-fair-representation framework, the Union had to show that causing Legley's discharge was "necessary to the effective performance of [the Union's] function of representing its constituency." And that conclusion brings us, then, to the question of how the Board actually applied that test.

## IV.

Here, the Board applied the "necessary" test from Operating Engineers by ruling against the Union on the ground that the Union failed to meet its burden under that test because the Union made no effort to meet it. Indeed, the Board asserted that, rather than attempting to satisfy that test, the Union instead gave a reason for the employee's firing that the Board concluded was one that no one disputes showed the Union was motivated by Legley's protected statements. In other words, according to the Board, the Union merely set forth a reason that would not pass muster even under the motive-focused test of Wright Line.

-80-

In light of these aspects of the Board's decision, one might be forgiven for thinking that the resolution of the issue regarding whether the Union committed an unfair labor practice under the duty-of-fair-representation framework in causing Legley's discharge is quite straightforward. The Board applied a particular test under the duty-of-fair-representation framework to evaluate the Union's conduct. The Board then explained that the Union made no effort to meet that test. Case closed.

But, alas, things are not so simple. As it turns out, the Board's ruling under the Operating Engineers test cannot be upheld on either of the two grounds that the Board offered.

As the majority rightly notes, the Administrative Law Judge did not apply the duty-of-fair-representation framework at all -- let alone the test under that framework set forth in Operating Engineers. Ante at 19. The Board thus arguably did not give the Union notice that it would need to satisfy the duty-of-fair-representation test as articulated in Operating Engineers. And so, because the Union's failure to argue to the Board that the test was met is excusable, waiver is no ground for upholding the Board.

The Board is also wrong to have characterized the Union as having been motivated by Legley's protected conduct. As the majority well explains, the record does not provide substantial

evidence to show that the Union was motivated by Legley's protected conduct rather than by Lavigne's distress. Because the Board's characterization of the Union's reason for discharging Legley is unsupportable, the Board may not rely on that characterization to justify its conclusion that the Union failed to show that its action was necessary to its continued functioning. And thus the Board may not rely on that reasoning to conclude that the Union failed to meet its burden under the distinct Operating Engineers test that the Board seemingly applied.

Nevertheless, the problems with the Board's reasoning in applying the test from Operating Engineers do not relieve the Union of its obligation to make some argument that it does in fact meet the "necessary" test that Operating Engineers set forth in applying the duty-of-fair-representation framework. And, unless the Union has done so, we have no choice but to sustain the Board's ruling. We thus come to the final issue: has the Union done so?

**V.**

As best I can tell, in its briefing to us, the Union does not directly argue that it has satisfied the Operating Engineers test. Rather, it argues only that it has met three other standards for evaluating its conduct -- the one described in Wright Line that we have already discussed, as well as two developed by the Board in a pair of cases decided after Operating

Engineers but that are nevertheless cast by the Board as tests that, like Operating Engineers and unlike Wright Line, may be deployed to determine whether a union has committed an unfair labor practice in light of its duty of fair representation.

The first of these two formulations of the standard is laid out in Glaziers, 271 N.L.R.B. 583, which, as I have discussed, itself involved an application of the Operating Engineers test, but arguably uses a formulation that emphasizes the need to focus on the union's motive. The second of these two formulations of the standard is set forth in Caravan Knight, which seems on its face distinguishable from the motive-based one used in Wright Line, even though it perhaps could be read to be a good deal less demanding than the test deployed in Operating Engineers itself. Caravan Knight, 362 N.L.R.B. No. 196, slip op. at 4 (describing the union's rebuttal burden as one that requires showing that its actions were "done in good faith, based on rational considerations, and were linked in some way to its need effectively to represent its constituency as a whole") (emphasis added).[24]

By invoking Wright Line, Glaziers, and Caravan Knight, but not Operating Engineers, the Union's brief, generously read, does not thereby bypass the only issue that matters -- whether the

---

[24] We note that the Board has not determined whether either of these tests may satisfy the test laid out in Operating Engineers.

Union has met the test that the Board applied in this case in evaluating the Union's conduct under the duty-of-fair-representation framework. Rather, by invoking these three Board precedents and eschewing any effort to address Operating Engineers, the Union's brief appears to be arguing that a union's rebuttal burden under the duty-of-fair-representation framework is not as different from the one set forth in Wright Line as Operating Engineers would seem to indicate that it is. And, further, the Union's brief seems to be arguing that, in this very case, the Board understood the test that it applied under the duty-of-fair-representation framework to be more motive-focused, and thus Wright Line-like, than might seem to be the case on a first read of the Board's decision, given the decision's use of the "necessary" test that Operating Engineers deployed.

Such an argument draws support, arguably, from the existence of the other formulations of the test that the Board has relied on to determine whether a union has met its rebuttal burden under the duty-of-fair-representation framework -- formulations that the Board acknowledges in its opinion in this very case when it notes that it has "characterized the union's rebuttal burden under the duty-of-fair-representation framework in different ways." The Union's argument thus may be understood to proceed that, in light of this jumble of Board precedents on this issue,

the seemingly strict "necessary" test from <u>Operating Engineers</u> has been watered down over time such that "necessary" doesn't really mean "necessary."  In consequence, on this view, this test is, despite <u>Operating Engineers</u>, really focused on the union's motive in acting rather than on the strength of its interest in acting, as virtually any lawful motive for a union acting as it did that is not based on animus against the employee's protected conduct would suffice.  See <u>Glaziers</u>, 271 N.L.R.B. at 585 (holding that the union need show only that "the conduct complained of was referable to other considerations, lawful in themselves, and wholly unrelated to the exercise of protected employee rights or other matters with which the Act is concerned"); <u>Caravan Knight</u>, 362 N.L.R.B. No. 196, slip op. at 4 (holding that the union need show only that its conduct was "done in good faith, based on rational considerations, and were linked in some way to its need effectively to represent its constituency as a whole").  And so, the Union might fairly be read to be arguing that, under the Board's precedent, it can win under the duty-of-fair-representation framework the same way it can win under <u>Wright Line</u>: by showing that the Union acted against Legley because Legley was disruptive in the workplace rather than because of any protected conduct in which he engaged.

Insofar as the Union is contending that the test under the duty-of-fair-representation framework that the Board applied in this case -- though stated in words that mimic the distinct, strength-of-interest test from Operating Engineers -- is in substance a motive-based test like the Wright Line test, I am quite skeptical that the argument has much force. As I have explained, the Board's reasoning in Operating Engineers indicates that it would have sound reason to inquire not just into a union's motives, but also the nature and significance of its interest in causing an employee's discharge. Such a further inquiry would help ensure that the other employees whom the union is duty-bound to represent would not mistake the action taken by the union against that employee for a signal that they need to support the union or risk suffering a similar fate. And, as I have also explained, the Board's use of Operating Engineers in this case indicates that the Board applied that distinct inquiry.

But, in the end, it is up to the Board to make the call as to whether the test under the duty-of-fair-representation framework is one that focuses on ferreting out the union's ill motivation or one that focuses on guarding against the potentially unintended intimidating effect of the union's action by scrutinizing the union's need to act as it did. Thus, I see no harm in requiring the Board to make that call more clearly in this

-86-

case than it has, given the somewhat cryptic nature of the Board's articulation of its reasoning in its decision in this case; the fact that the Union did not have clear notice of its need to engage on this issue below; and the fact that the Board's precedents in this area, by the Board's own admission in this case, have used different formulations. There is, after all, good reason to make agencies turn square corners, given the deference that they request from us. And so I see the virtue of making the Board turn them here.

I do not see any good reason, however, for us simply to assume that the Board was applying a test under the duty-of-fair-representation framework that in this case would be more favorable to the Union than the one that the Board applied in Operating Engineers -- whether that test is best described by the formulation in Glaziers or Caravan Knight or whether it is, in practical effect, substantively identical to Wright Line. After all, the Board explicitly relied on the language of Operating Engineers in its analysis. Thus, in my view, we should remand to the Board so that it can consider the arguments that (1) the "necessary" test it applied in this case actually means something other than what it meant in Operating Engineers, and (2) the "necessary" test the Board applied here in fact may mean something that is (a) no different from (or, at least, very close to) the test set forth in

<u>Wright Line</u> itself or (b) though different, no stricter than the test set forth in <u>Caravan Knight</u>.  <u>Cf.</u> 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."); <u>NLRB</u> v. <u>Richards</u>, 265 F.2d 855, 862 (3d Cir. 1959) (remanding to the Board to rule on objection made for the first time to the appeals court, where the petitioner had no opportunity to present the argument earlier).  To do otherwise, it seems to me, is to permit the Union to win on the basis of a rule that we have no reason to believe is the right rule in the Board's judgment.  And, that course would permit the Union to win on the basis of a rule that the Board has never applied with the benefit of our explanation as to why its <u>Wright Line</u> analysis fails.

To be sure, the Board, on remand, may explain that it intended to apply a test that is oriented around determining whether the union's motivation was based on the employee's protected conduct and thus is one that in substance is the same as the <u>Wright Line</u> test.  And, it may do so by concluding that the "necessary" test first set forth in <u>Operating Engineers</u> has come to mean something so different from what it first seemed to mean that it is in effect the <u>Wright Line</u> test.  Insofar as the Board

-88-

chooses that course, then, presumably, the Union will win for the same reason we conclude that it should win under Wright Line.

But, it is also possible that the Board may reaffirm the applicability of the test set forth in Operating Engineers as it was applied in that case -- an approach that would ensure that the inquiry under the duty-of-fair-representation framework is not a redundant reprise of the inquiry already required by Wright Line.[25] And, if the Board chooses that course -- as the Board's precedent suggests to me that it will -- a remand will still have been useful. On remand, the Board will face a more difficult question in applying that test, as it now knows that it may not rule against the Union under that test on the ground that the Union actually fired Legley for his protected conduct. Thus, the Board will have to decide -- as it did not decide the first time around -- whether Legley's disruptive conduct in the workplace provided a sufficient basis for the Union not merely to take some less drastic measure in response but instead to seek to have his employer fire him.

Perhaps the Board would conclude that such a reason passes muster under Operating Engineers. But it is not at all clear to me that, under Board precedent, the Board would do so. In

---

[25] Insofar as adherence to Operating Engineers would mark a change from subsequent formulations articulated by the Board, the Union makes no argument that the Board is barred from making that change.

Operating Engineers itself, disruptive employee behavior in union settings was deemed not to be sufficient reason for the union to attempt to get an employee fired. I cannot say with any confidence that the fact that the disruptive conduct here occurred in a workplace setting rather than a union one requires a change in the analysis.

Finally, it is possible that the Board will conclude that Caravan Knight best stated the rule of "necessary" test, which is not as strict as Operating Engineers would make it seem. In Caravan Knight, which was decided after Operating Engineers, the Board required the union to show not only that it has a lawful motivation but also that its interest in causing the discharge is "linked in some way to its need to effectively represent its constituency as a whole." 362 N.L.R.B. No. 196, slip op. at 4. The Union then won under that test only after the Board determined that the union's interest was in preventing physical violence by an employee. Id. at 5-6. The facts here do not appear, however, to rise to that same level. Thus, these facts do not appear -- of necessity -- to require the Board to reach a similar conclusion in this case.

So, to sum up, I don't see a basis for simply reversing. Between Caravan Knight -- in which the Board held that a union interest stronger than the one at issue here did suffice -- and

<u>Operating Engineers</u> -- in which the Board held that a union interest weaker than the one at issue here did not suffice -- we are left without guidance from the Board on what determination it would reach in this case. Only if <u>Wright Line</u> were the test would it be appropriate for us to reverse. But that is the outcome hardest to square with the Board's opinion in this case.

For these reasons, a remand would not only serve the purpose of forcing the Board to make clear what standard it is applying, but also ensure that the Board has a chance to apply whatever standard it identifies as the right one to the facts of this case. <u>See</u> <u>Manhattan Ctr. Studios, Inc.</u> v. <u>NLRB</u>, 452 F.3d 813, 816 (D.C. Cir. 2006) ("If we conclude that the Board misapplied or deviated from its precedent, we often remand with instructions to remedy the misapplication/deviation."); <u>see also</u> <u>Regal Knitwear Co.</u> v. <u>NLRB</u>, 324 U.S. 9, 13 (1945) ("Administrative agencies have considerable latitude to shape their remedies within the scope of their statutory authority and, where the infirmity is inadequacy of findings to show appropriateness of the choice made in the particular case, are ordinarily entitled to have the case remanded for further consideration.").

## VI.

I realize that I have addressed this one discrete issue at some length. And I realize, too, that in the end this extended

analysis results in what may seem like a rather modest divergence from the position taken by the majority. After all, the distinction between reversing, on the one hand, and vacating and remanding, on the other, may seem like a technical one. And, in a sense, it is.

But, in another sense, it is not, which is why I have thought it important to explain my understanding of what is at issue here in such detail. If the Board has erred in not speaking with the clarity that we should demand of it, the fact remains that the Board has been charged by Congress with the task of administering this statute. See Auciello Iron Works, Inc. v. NLRB, 517 U.S. 781, 787-88 (1996) (noting the "considerable deference that the Board is due by virtue of its charge to develop national labor policy" (citation omitted)). The Board should not be precluded from performing that administrative task.

Just what the Board thinks that task is remains arguably up for debate. For that reason, I have thought it useful to spend some time laying out my own understanding of what the Board's precedents -- somewhat hard to decipher though they are -- suggest that the Board believes that task to be. Doing so, I hope, will help ensure that the Board does not engender the kind of confusion in the future in applying the duty-of-fair-representation framework that it has engendered here.

But, insofar as the Board has not made clear what it thinks it must decide in applying that framework, my concern is that, by deciding the matter for ourselves and giving the Board no chance to clear things up, we inevitably substitute our own less informed understanding of labor dynamics for that of the Board. Because I do not believe Congress has given us any warrant to do so, I respectfully dissent.